COMMONWEALTH *VS.* THOMAS S. LEVESQUE
(and eleven companion cases[1]).

Worcester. January 10, 2002. - March 29, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ. ·

*Homicide. Wanton or Reckless Conduct. Grand Jury. Practice, Criminal,*
    Grand jury proceedings.

Evidence presented to a grand jury that criminal defendants had started a fire
    and then increased the risk of harm from that fire without taking adequate
    steps to report it to the proper authorities, that the defendants' choice not to
    report the fire was intentional and reckless, that the defendants' conduct
    was the cause that necessarily set in operation the factors that caused the
    deaths of six fire fighters who fought the fire, and that the inability of the
    fire fighters to navigate the building or estimate the true caliber of the
    danger was foreseeable to those in the defendants' position as a part of the
    normal risks of combating a fire, was sufficient to constitute probable
    cause that the defendants had committed the crime of involuntary
    manslaughter and to justify a return of indictments for that crime. [447-454]
This court addressed the defendants' argument, rejected by the judge below
    but reasserted by the defendants on appeal as an alternative basis for the
    judge's dismissal of the indictments against them, that grand jury proceed-
    ings against them were impaired by the Commonwealth's misleading
    presentation of the evidence, even though the defendants could not have
    appealed from the judge's ruling [454-455]; further, this court, in conclud-
    ing that the grand jury proceedings were not impaired, rejected the
    defendants' claims that the Commonwealth failed to present certain
    exculpatory evidence, the omission of which was not sufficiently material
    that it would have probably affected the outcome [455-456], that certain
    testimony misled the grand jury as to when a telephone call had been
    placed, the time of which was not relevant [456], that the prosecutor
    elicited testimony that created a false impression of why fire fighters had
    entered the building that the defendants were charged with setting on fire
    [457], and that the form of the indictments was insufficient to inform the
    defendants of the elements of the crime charged [457-458].

INDICTMENTS found and returned in the Superior Court Depart-
ment on February 18, 2000.

Motions to dismiss were heard by Timothy S. Hillman, J.

[1]Six against Julie Ann Barnes and five against Thomas S. Levesque.

The Supreme Judicial Court granted an application for direct appellate review.

*Christopher P. Hodgens,* Assistant District Attorney (*Harry D. Quick, III,* Assistant District Attorney, with him) for the Commonwealth.

*Louis P. Aloise (Michael C. Wilcox* with him) for Julie Ann Barnes.

*Edward P. Ryan, Jr.,* for Thomas S. Levesque.

COWIN, J. A grand jury in Worcester County returned six indictments against each defendant for involuntary manslaughter, G. L. c. 265, § 13. The indictments were based on grand jury testimony concerning the defendants' conduct in starting by accident and then failing to report a fire in the Worcester Cold Storage factory building (warehouse), which took the lives of six Worcester fire fighters. The defendants moved to dismiss the manslaughter indictments on grounds that (1) the evidence presented to the grand jury was insufficient to justify the return of indictments for involuntary manslaughter, see *Commonwealth v. McCarthy,* 385 Mass. 160, 163 (1982); and (2) the integrity of the grand jury proceeding was impaired, see *Commonwealth v. O'Dell,* 392 Mass. 445, 446-447 (1984). A judge of the Superior Court allowed the motions to dismiss based on the first ground, that the evidence before the grand jury was insufficient to support the indictments, because the defendants had no legal duty to report the fire and their failure to act did not satisfy the standard of wanton and reckless conduct required for manslaughter charges. The Commonwealth appealed, and we granted the defendants' joint application for direct appellate review. Because we conclude that the evidence before the grand jury is sufficient to support the defendants' prosecution for manslaughter, we reverse the order of the Superior Court.

The evidence presented to the grand jury, viewed in the light most favorable to the Commonwealth, indicated the following.[2] See *Commonwealth* v. *Catalina,* 407 Mass. 779, 781 (1990).

---

[2]Three witnesses testified before the grand jury: Detectives Michael Mulvey and Michael Angelo Sabatalo of the Worcester police department and Sergeant Robert F. O'Keefe of the Massachusetts State police. Detective Mulvey recited information about the victims from autopsy reports. Detective Sabatalo related his own observations on arrival at the fire scene, read a police

For several months prior to December 3, 1999, the defendants lived in a room on the second floor of the vacant five-story warehouse. The warehouse was a cold storage building and, as such, had brick walls, wood framing, and a compartmentalized floor plan with many small windowless rooms insulated with cork and styrofoam. The second floor where the defendants stayed had some windows, but those windows were boarded up. The room occupied by the defendants contained a bed, closet, and personal effects, including clothing, blankets, a radio, a wooden end table, and a kerosene heater. The defendants had an operable cellular telephone, food, and pets. Because there was no electricity, a flashlight, candles, and a heater were used for light. On more than one occasion, the defendants had an overnight guest in these quarters.

Approximately one month before the fire, a K-9 police officer with his dog responded to a complaint about the conditions in the warehouse and found signs of occupancy. The officer encountered an overwhelming odor of "rotting garbage, feces and urine." One room contained "piles of garbage bags and numerous take-out food-type containers with half[-]eaten meals thrown all over the place. Next to a far wall were piles and piles of human waste." A "makeshift bedroom" was discovered, containing a bed, clothes, and a closet with a box "overflowing with cat feces." Unable to move without stepping on rotting garbage or feces, the police officer terminated the search out of concern for the health and safety of his dog.

On the afternoon of December 3, 1999, between 4:15 P.M. and 4:30 P.M., the defendants had a physical altercation in their bedroom at the warehouse that resulted in the knocking over of a lit candle. A fire started and the defendants tried unsuccessfully to put the fire out with their feet and a pillow. The fire spread rapidly until everything in the room began to burn. The defendants searched for the cat and dog that lived in the

report, and recited statements, including those taken from the defendants. Sergeant O'Keefe testified to his own observations; the investigation undertaken by local, State, and Federal authorities; and the origin and cause of the fire. After detailing his background in fire investigation and explosion investigation, he opined on the impact of the delayed reporting of the fire.

warehouse with them but the search was futile. The defendants left the warehouse and did not report the fire to the authorities.

After leaving the warehouse, the defendants passed several open businesses and shopping mall stores where public telephones were available. Between 4 and 5 P.M., the general manager of Media Play store saw the defendants in his store and heard Julie Barnes say, "I can't believe I lost all my stuff . . . . I lost everything. I don't have anything. I lost all my stuff. I can't believe I lost everything." Thomas Levesque replied, "Don't worry about it. Let's go." After leaving Media Play, the defendants walked around the mall until they left to get dinner. They returned to the mall where they first went back to Media Play to listen to more music, and then went to a Sports Authority store to get a job application. The defendants subsequently went to Regina Guthro's house where Levesque remained until the next morning.[3] Barnes spent the night with Bruce Canty at a hotel where both Barnes and Canty viewed the ongoing warehouse fire from their hotel room window.

Levesque made three telephone calls from his cellular telephone the day of the fire. One call was made at approximately 6 A.M. The record is unclear whether the other calls, at 11:20 and 11:28 (made to the hotel where Barnes was staying), were made in the morning or the evening. The next telephone call was placed from Levesque's cellular telephone four days after the fire.

The fire was not reported until 6:13 P.M. that evening, when an emergency caller reported the fire. Sergeant O'Keefe, an expert in arson and fire investigations, stated that "the significance of the delay in reporting [the fire] ha[d] a great deal to do with what kind of fire the Worcester Fire Department got to that day." After arriving on the scene, fire fighters were informed that there might be homeless persons inside the warehouse. The fire fighters entered the warehouse in an effort to locate any persons that might have been inside, and to evaluate their tactics to combat the fire. It was during these efforts

---

[3]The State police apparently went to Guthro's house on the night of the fire in an attempt to contact Levesque. Although Levesque told Guthro that he heard the police at the door during the night, no one answered the door.

that six fire fighters went into the building and never returned. Rescuers recovered their remains during the eight days that followed.

A joint investigation by the Worcester fire department, the Massachusetts State police fire and explosion investigation section, and the United States Bureau of Alcohol, Tobacco and Firearms revealed that the warehouse fire, which originated in the defendant's second-floor "makeshift" bedroom, was most likely accidental and the result of an open candle flame in contact with combustible material. Remnants of the defendants' belongings, including plastic milk crates, an outline of a bed-type structure, the remains of a dog and cat, a candle, and a telephone calling card, were found among the debris.

*Standard of review.* Our inquiry here is limited to whether the evidence presented to the grand jury was sufficient to support the defendants' indictments for involuntary manslaughter. *Commonwealth* v. *Catalina*, 407 Mass. 779, 790 (1990). We consider only whether "the grand jury [heard] sufficient evidence to establish the identity of the accused . . . and probable cause to arrest [them]" for the crimes charged (citations omitted). *Commonwealth* v. *McCarthy*, 385 Mass. 160, 163 (1982). Probable cause requires sufficient facts to warrant a person of reasonable caution in believing that an offense has been committed, see *Commonwealth* v. *Catalina, supra* at 790, citing *Carroll* v. *United States*, 267 U.S. 132, 161 (1923); this standard requires considerably less than that which is required to warrant a finding of guilt. *Commonwealth* v. *O'Dell*, 392 Mass. 445, 451 (1984). Where, however, the Commonwealth has not produced any evidence of the defendant's criminal activity, see *Commonwealth* v. *McCarthy, supra* at 162-164, or has impaired the integrity of the grand jury by knowingly using false testimony to procure an indictment, see *Commonwealth* v. *Salman*, 387 Mass. 160, 166-168 (1982), or has provided evidence that gives a distorted picture of its probative force, see *Commonwealth* v. *O'Dell, supra* at 446-452, the indictment must be dismissed. *Commonwealth* v. *Brien*, 19 Mass. App. Ct. 914 (1984).

*Sufficiency of the evidence.* Because Massachusetts has not defined manslaughter by statute, its elements are derived from the common law. *Commonwealth* v. *Godin*, 374 Mass. 120, 126

(1977). Involuntary manslaughter is "an unlawful homicide, unintentionally caused . . . by an act which constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct." *Commonwealth* v. *Catalina, supra* at 783, quoting *Commonwealth* v. *Campbell,* 352 Mass. 387, 397 (1967). The defendants argue that the evidence presented to the grand jury is insufficient to constitute probable cause that they have committed the crime of manslaughter. Specifically, the defendants contend that they did not have a duty to report the fire, thus rendering the evidence insufficient to demonstrate wanton and reckless conduct, and that the evidence does not support a finding that the fire fighters' deaths were caused by their failure to report the fire.

*Duty to report the fire.* Wanton or reckless conduct usually consists of an affirmative act "like driving an automobile or discharging a firearm," *Commonwealth* v. *Welansky,* 316 Mass. 383, 397 (1944). An omission, however, may form the basis of a manslaughter conviction where the defendant has a duty to act. *Id.* at 397. See also *Commonwealth* v. *Twitchell,* 416 Mass. 114, 117 (1993) (parents may be convicted of manslaughter where child dies as result of reckless failure to seek medical attention). For example, in *Commonwealth* v. *Welansky, supra,* we upheld the manslaughter convictions of a nightclub owner where patrons of the establishment died in a disastrous fire. *Id.* at 393. The defendant was charged with involuntary manslaughter based on his failure to provide a safe means of escape from the nightclub in the event of a fire. *Id.* The court stated that the defendant owed a duty of care to the business visitors he invited onto his premises, and that "wanton or reckless conduct may consist of intentional failure to take such care in disregard of the probable consequences to [his customers] or of their right to care." *Id.* at 397.

The motion judge reasoned that because the Commonwealth has conceded that the fire was started accidentally, and because "Massachusetts courts have not found a duty to report or extinguish a fire where defendants' failure to do so was merely negligent," the defendants, as a matter of law, violated no duty. He concluded that one who negligently creates a risk of death or injury to others is free to walk away from that risk without taking steps to minimize the danger. We disagree.

It is true that, in general, one does not have a duty to take affirmative action; however, a duty to prevent harm to others arises when one creates a dangerous situation, whether that situation was created intentionally or negligently. When formulating duties in the criminal context, we have, in the past, drawn on the duties imposed by civil law. For example, in *Commonwealth* v. *Twitchell*, 416 Mass. 114 (1993), we held that parents can be convicted of the involuntary manslaughter of their child if the failure to provide medical care for the child results in death. *Id.* See *Commonwealth* v. *Clark*, 393 Mass. 361 (1984). The court found a duty by drawing on a parent's established civil duty to support sufficiently his or her child. *Commonwealth* v. *Twitchell*, *supra* at 118.

Our law, both civil and criminal, imposes on people a duty to act reasonably. See *Onofrio* v. *Department of Mental Health*, 408 Mass. 605, 610 (1990), *S.C.*, 411 Mass. 657 (1992) ("one who takes action ordinarily owes to everyone else who may be affected thereby a duty to act reasonably"). The civil law creates a specific duty that we may apply to the situation in this case. The Restatement (Second) of Torts § 321 (1) (1965) reads: "If the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect." Other jurisdictions have used this principle as a basis for criminal liability. See *United States* v. *Hatatley*, 130 F.3d 1399, 1406 (10th Cir. 1997) (defendant could be criminally liable for leaving robbery victim badly beaten in cold and remote location because "[w]hen a person puts another in a position of danger, he creates for himself a duty to safeguard or rescue the person from that danger"); *Jones* v. *State*, 220 Ind. 384, 387 (1942) (holding that one whose criminal act puts another in danger incurs duty to rescue that person); *State ex rel. Kuntz* v. *Montana Thirteenth Judicial Dist. Court*, 298 Mont. 146, 154 (2000) ("[W]hen a person places another in a position of danger, and then fails to safeguard or rescue that person, and the person subsequently dies as a result of this omission, such an omission may be sufficient to support criminal liability").

Although we have yet to recognize explicitly § 321 as a

basis for civil negligence, see *Panagakos* v. *Walsh*, 434 Mass.
353, 356 (2001), we have expressed agreement with its underly-
ing principle. It is consistent with society's general understand-
ing that certain acts need to be accompanied by some kind of
warning by the actor. See, e.g., *Oliveri* v. *Massachusetts Bay
Transp. Auth.*, 363 Mass. 165, 166-167 (1973) (landlord has
duty to make premises under his control safe or warn of
dangers); *H.P. Hood & Sons* v. *Ford Motor Co.*, 370 Mass. 69,
75 (1976) (manufacturer has duty to eliminate known dangers
of product or provide adequate warning of latent dangers). In
*Onofrio* v. *Department of Mental Health, supra*, we held that
employees of the Department of Mental Health breached a duty
owed to the owner of a rooming house by soliciting a client's
placement in the house without providing the owner with suf-
ficient information about the client's mental health history. *Id.*
at 610. The owner suffered property damage when the client set
fire to the house. *Id.* at 606. The court concluded that the
employees, "by taking action that exposed [the owner] to risk
. . . were bound, as any other person would be, to act
reasonably." *Id.* at 610. In *Onofrio*, the act of placing the client
in the house was not in itself negligent, but by placing the cli-
ent, the employees of the Department of Mental Health created
a risk that resulted in a corresponding duty to warn. We agree
with this principle and apply it to this case; where one's actions
create a life-threatening risk to another, there is a duty to take
reasonable steps to alleviate the risk. The reckless failure to
fulfil this duty can result in a charge of manslaughter.

Where a defendant's failure to exercise reasonable care to
prevent the risk he created is reckless and results in death, the
defendant can be convicted of involuntary manslaughter. Public
policy requires that "one who creates, by his own conduct . . .
a grave risk of death or injury to others has a duty and obliga-
tion to alleviate the danger." *People* v. *Kazmarick*, 99 Misc. 2d
1012, 1016 (N.Y. County Ct. 1979). We are not faced with the
situation of a mere passerby who observes a fire and fails to
alert authorities; the defendants started the fire and then
increased the risk of harm from that fire by allowing it to burn

without taking adequate steps either to control it or to report it to the proper authorities.[4]

Whether a defendant has satisfied this duty will depend on the circumstances of the particular case and the steps that the defendant can reasonably be expected to take to minimize the risk. Although, in this case, the defendants apparently could not have successfully put out the fire, they could have given reasonable notice of the danger they created. It was for the grand jury (and later, the petit jury) to decide whether the defendants' failure to take additional steps was reasonable, and if not, whether the defendants' omission constituted wanton or reckless conduct.[5]

*Wanton or reckless conduct.* A defendant's omission when there is a duty to act can constitute manslaughter if the omission is wanton or reckless. *Commonwealth* v. *Welansky, supra* at 397. The words "wanton" and "reckless" constitute conduct that is "different in kind" than negligence or gross negligence. *Id.* at 400. It has been defined as "intentional conduct . . . involv[ing] a high degree of likelihood that substantial harm

---

[4]A New York trial court judge found a duty to act under similar circumstances. In *People* v. *Kazmarick*, 99 Misc. 2d 1012 (N.Y. County Ct. 1979), the judge held that a defendant who accidently started a fire by throwing a match in the hallway of an occupied apartment building could be found guilty of manslaughter in the second degree for his failure to report the fire. *Id.* at 1015-1017. Manslaughter in the second degree is defined by statute in New York as "recklessly caus[ing] the death of another person." N.Y. Penal Law § 125.15(1) (McKinney 1997). The judge held that "one who creates, by his own conduct, whether criminal or non-criminal conduct, a grave risk of death or injury to others has a duty and obligation to alleviate the danger, or, at the very least, to prevent the injury or death by alerting the probable victims to the danger." *Id.* at 1016. Although Massachusetts does not define manslaughter by statute, our definition of manslaughter is laid out by the common law and mirrors New York's statutory definition. *Commonwealth* v. *Catalina*, 407 Mass. 779, 783 (1990).

[5]The defendants assert that imposing a duty to report the fire in this case would violate their right against self-incrimination under the Fifth Amendment to the United States Constitution because the defendants were present in the warehouse as trespassers, and reporting the fire could have exposed them to criminal charges. The defendants could have brought the fire to the attention of authorities without disclosing their status as trespassers, and a duty may exist even if such disclosure were necessary. There is no merit to the defendants' additional argument that an obligation to report the fire would constitute selective prosecution because the defendants are homeless.

will result to another." *Id.* at 399. To constitute wanton or reckless conduct, "the risk of death or grave bodily injury must be known or reasonably apparent, and the harm must be a probable consequence of the defendant's election to run that risk or of his failure reasonably to recognize it." *Sandler* v. *Commonwealth*, 419 Mass. 334, 336 (1995). Under Massachusetts law, recklessness has an objective component as well as a subjective component. A defendant can be convicted of manslaughter even if he was "so stupid [or] so heedless . . . that in fact he did not realize the grave danger . . . if an ordinary normal man under the same circumstances would have realized the gravity of the danger." *Commonwealth* v. *Welansky*, *supra* at 398-399.

The judge, after reviewing the evidence presented to the grand jury, concluded that "the pertinent evidence would not warrant a finding of probable cause that the defendants' failure to report the fire rose to the elevated standard of a high degree of likelihood that substantial harm would result." We disagree. When testing the sufficiency of the evidence to sustain a grand jury indictment, we need not determine that the evidence would allow a reasonable person to find the conduct wanton or reckless beyond a reasonable doubt. As discussed above, we need only find the evidence sufficient for a grand jury to find probable cause that the crime charged has been committed by these defendants. *Commonwealth* v. *Catalina*, *supra* at 790. Whether certain behavior is properly categorized as reckless or negligent is ordinarily left for the jury. *Dixon* v. *New York, N.H. & H.R.R.*, 207 Mass. 126, 130 (1910). See *Commonwealth* v. *Chapman*, 433 Mass. 481, 488 (2001) ("The defendant's contention that her acts and omissions were themselves accidents was a question for the jury").

Although it is true that recklessness must involve an intentional act or omission, a finding of recklessness is grounded in intent to engage in the reckless conduct, and not intent to bring about the harmful result. *Commonwealth* v. *Bouvier*, 316 Mass. 489, 494 (1944) ("It is settled in cases of homicide that one who wantonly or recklessly does an act that results in the death of a human being is guilty of manslaughter although he did not contemplate such a result"). Thus, the grand jury needed

to determine only that the defendants' choice not to report the fire was intentional, not that the fire was intentionally set. See *Commonwealth* v. *Cali*, 247 Mass. 20, 24 (1923) (finding that for purposes of arson, defendant could form the requisite intent by intentionally choosing not to report fire in order to collect insurance money, even though fire had started negligently).

The Commonwealth has presented sufficient evidence to allow a grand jury to conclude that the defendants' choice not to report the fire was intentional and reckless. The following testimony was sufficient in this regard: the defendants attempted to put out the fire and were unsuccessful, thus demonstrating they were cognizant of the fire's rapid spread; they observed the fire consume their possessions over a short period of time; they were forced to abandon their attempts to rescue their pets, again evidencing their awareness of the peril posed by the fire's rapid spread; they possessed a cellular telephone and passed several open stores after their exit from the warehouse, thus allowing the grand jury to infer that the defendants had multiple opportunities and the means to call for help if they chose to do so. Further, the testimony that the defendants went shopping and calmly ate a meal after leaving the building refutes any suggestion that panic might explain a failure to report the fire. Finally, the fact that the defendants may have faced criminal liability for trespass had they informed authorities that they had been living in the warehouse provided a motive for their failure to report the fire.

The defendants also assert that their conduct could not have been reckless because it was unforeseeable that such grievous harm would result to the fire fighters who responded. The Superior Court judge agreed, noting that fire fighters ordinarily do not lose their lives in the course of fighting a fire, and that even the fire fighters themselves failed to appreciate the gravity of the danger.[6] However, an uncontrolled fire is inherently deadly to all who may come into contact with it, whether fire fighters or ordinary citizens. The defendants are charged with this knowledge.

---

[6]The evidence the defendants rely on in asserting that even the fire fighters themselves could not appreciate the risk of the fire was not presented to the grand jury. Therefore, we cannot properly consider it in determining the sufficiency of the indictments.

*Causation.* The defendants assert that the failure to report the fire was not the legal cause of the fire fighters' deaths. They argue that the fire fighters would have entered the building regardless of whether they thought the defendants were on the premises, and the Commonwealth did not demonstrate that the failure to report the fire resulted in a more deadly fire.

We have previously held that an arsonist can be charged with the murder of a fire fighter who responded to the resulting fire if the defendant's conduct is "the efficient cause, the cause that necessarily sets in operation the factors which caused the death." *Commonwealth* v. *Rhoades*, 379 Mass. 810, 825 (1980). The Commonwealth presented sufficient evidence for indictment on this basis. Sergeant O'Keefe, an expert in fire investigations, testified that "the significance of the delay in reporting ha[d] a great deal to do with what kind of fire the Worcester Fire Department got to that day." O'Keefe stated that the delay permitted the fire to smolder and spread within the building, increasing the severity of the risk.[7] Even without this expert testimony, the grand jurors' common knowledge of the nature of fire would have allowed them to conclude that a fire spreads and becomes more dangerous the longer it is left unattended.

The defendants argue that certain actions by the fire department contributed to the fire fighters' deaths, such as the fire fighters' inability to navigate the maze-like building, and the fire fighters' ignorance of the true extent of the danger posed by the fire. However, "the intervening conduct of a third party will relieve a defendant of culpability only if such an intervening response was not reasonably foreseeable." *Commonwealth* v. *Askew*, 404 Mass. 532, 534 (1989). The inability of the fire fighters to navigate the building or estimate the true caliber of the danger was foreseeable to those in the defendants' position as a part of the normal risks of combating a fire.

*The integrity of the grand jury proceedings.* The defendants claim that the grand jury proceeding was impaired by the Com-

---

[7]The defendants contest O'Keefe's ability to give such an opinion "[g]iven his lack of personal knowledge and his unfamiliarity with the crucial details of the fire . . . ." However, O'Keefe described his investigation and qualifications in detail to the grand jury, and explained that he arrived at the scene of the fire after the initial firefighting efforts had already begun. Thus, the grand jury were aware of the knowledge on which he based his testimony.

monwealth's misleading presentation of the evidence. This argument was rejected by the judge, but the defendants reassert the argument as an alternative basis for dismissing the indictments. The Commonwealth contends that we may not reach this alternative argument because the motion judge rejected it, and the defendants do not have a right of interlocutory appeal from the denial of their motion on that ground. The Commonwealth relies on G. L. c. 278, § 28E, which gives the Commonwealth the right to appeal from the dismissal of an indictment, but does not grant a defendant the right to pursue an interlocutory appeal from denials of a motion to dismiss. The Commonwealth argues that the defendants' assertion of the alternative ground is an improper attempt to appeal from the motion judge's denial of their motions to dismiss on that ground.

The Commonwealth's argument fails because we have held that "on appeal [an appellate court] may consider any ground apparent on the record that supports the result reached in the lower court." *Gabbidon* v. *King*, 414 Mass. 685, 686 (1993). J.R. Nolan, Civil Practice § 1019 (Supp. 2001). Therefore, "[a] prevailing party is . . . entitled to argue on appeal that the judge was right for the wrong reason, even relying on a principle of law not argued below." *Aetna Cas. & Sur. Co.* v. *Continental Cas. Co.*, 413 Mass. 730, 734-735 (1992). This rule is applicable to criminal cases. See *Commonwealth* v. *Mottola*, 10 Mass. App. Ct. 775, 781 (1980). Thus, we address the defendants' argument even though they could not have appealed from the ruling of the motion judge on the question of the integrity of the grand jury proceedings.

The defendants allege three flaws in the presentation of the evidence before the grand jury: (1) the Commonwealth failed to present the exculpatory report of Deputy District Chief Michael McNamee of the Worcester fire department; (2) the testimony of Sergeant O'Keefe misled the jury to believe that a cellular telephone call was placed after the fire when it was in fact placed before the fire; and (3) the testimony erroneously suggested that the fire fighters rushed into the building to look for the defendants. We reject the defendants' claims.

The Commonwealth does not have an obligation to present all potentially exculpatory evidence to the grand jury. *Com-*

*monwealth* v. *O'Dell*, 392 Mass. 445, 447 (1984). However, the Commonwealth's presentation cannot be "unfair and misleading." *Id.* To justify dismissal of an indictment, a defendant must show that "inaccurate or deceptive evidence was given to the grand jury knowingly and in order to obtain an indictment and that the evidence probably influenced the grand jury's determination." *Commonwealth* v. *Drumgold*, 423 Mass. 230, 238 (1996).

In a report to the Worcester fire department board of inquiry, Chief McNamee stated that conditions at the warehouse deteriorated rapidly in a manner unanticipated by the fire fighters. The prosecutor did not present this report to the grand jury. The Commonwealth's omission was not sufficiently material that it would have probably affected the outcome. *Id.* The fact that the fire fighters were surprised by how rapidly the fire spread and how quickly conditions became uncontrollable is not related to the defendants' culpability. The defendants were obliged to notify the authorities of the fire regardless of their ability to predict the extent of the fire.

Sergeant O'Keefe testified that cellular telephone billing records showed three calls from Levesque's cellular telephone on the day of the fire: one at 6 in the morning, one at 11:20 and one at 11:28. The defendants fled the burning building between 4 P.M. and 5 P.M. that afternoon. The Sergeant did not specify whether the latter two calls were made in the morning or evening. Although the presentation of the evidence was not entirely clear, we do not believe that any confusion would have affected the indictments. Whether the calls were placed in the morning or evening was not relevant. The evidence was introduced to show that the defendants had the capacity and the means to make a telephone call. Regardless of whether the telephone calls in question were placed at 11 A.M. or 11 P.M., the record showed an outgoing call from the same cellular telephone four days after the fire. It is thus apparent that the grand jury could infer that the cellular telephone was working on the day of the fire, and that the defendants had the telephone with them when they fled the warehouse. From this information, the grand jury could have concluded that the defendants had access to a cellular telephone during the time in question.

Last, the prosecutor did not elicit testimony that falsely created the impression that the fire fighters rushed into the building solely to look for the defendants. In fact, the testimony indicates that the fire fighters entered the building both to look for individuals who may have been inside and to evaluate possible tactics for fighting the fire.

In addition, the defendants attack the form of the indictment as insufficient to inform the grand jurors of the elements of the crime. Although the defendants did not raise this issue below, we address their argument. General Laws c. 277, § 79, provides the proposed forms for manslaughter indictments: "That A.B. did assault and beat C.D., and by such assault and beating did kill C.D." However, the statute suggests a different form where neglect of a legal duty is the basis for a charge: "That A.B. being under the legal duty, and being of sufficient ability to provide C.D., who was his spouse, with sufficient food and drink for sustenance and maintenance, did neglect and refuse to do so; by reason whereof said C.D. being unable to provide sufficient food and drink, became and was mortally sick and died." *Id.* Although the charges against the defendants were based on the neglect of a legal duty, the indictments alleged that the defendants "did assault and beat [the fire fighters], and by such assault and beating did kill the said [fire fighters]."

The form of an indictment is sufficient where it gives the defendant reasonable knowledge of the crime with which he is being charged. *Commonwealth* v. *Welansky*, 316 Mass. 383, 396 (1944). In *Commonwealth* v. *Clark*, 393 Mass. 361 (1984), the defendant was charged with manslaughter for failing to provide medical care for a child after a fatal beating by the child's mother. *Id.* at 361, 362. As in this case, Clark's indictment followed the proposed indictment form for general manslaughter and not the more specific form suggested for neglect of a duty. *Id.* at 363. The court held that the general manslaughter indictment was sufficient to inform the defendant of the crime charged. *Id.* See *Commonwealth* v. *Welansky*, *supra* at 395-396 (count no. 15 of the indictment, in same form as manslaughter indictment in this case, was proper even though liability was premised on the defendant's failure to exercise a duty).

Further, we have examined the grand jury minutes and

conclude that there is no possibility that the grand jurors were confused as to the Commonwealth's theory of manslaughter. The defendants were charged with involuntary manslaughter based on their neglect of a duty to report the fire. That theory is apparent from the grand jury transcript. In fact, based on that transcript, the defendants understood the theory on which the indictments were based and effectively presented arguments before the Superior Court addressing that theory. Although it would have been preferable for the Commonwealth to use the more specific form of the manslaughter indictment, it would be a triumph of form over substance to force the Commonwealth to reindict in this situation. Because the Commonwealth does not have a duty to instruct the grand jury on the elements of the offense for which it seeks an indictment, *Commonwealth* v. *Noble*, 429 Mass. 44, 48 (1999), and because, as in *Commonwealth* v. *Clark*, *supra*, the indictments were sufficient to inform the defendants of the crime charged, and because the grand jury could not have been confused, the form of the indictment did not impair the integrity of the grand jury proceedings.

*Conclusion.* The order allowing the defendants' motions to dismiss is reversed. We remand the case to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*