## COMMONWEALTH vs. ANN POWER.

No. 07-P-368.

Middlesex. September 8, 2008. - March 4, 2010.

Present: RAPOZA, C.J., SMITH, & SIKORA, JJ.

*Homicide. Practice, Criminal, Instructions to jury. Wanton or Reckless Conduct. Evidence, Inference.*

At a murder trial, a Superior Court judge, in instructing the jury on a charge of involuntary manslaughter by wanton or reckless conduct, correctly declined to include the defendant's proposed instruction addressing the foreseeability of substantial harm, given that the doctrine of involuntary manslaughter by wanton or reckless conduct does not require specific foreseeability of the manner of harm or death. [404-405]

The evidence at a murder trial permitted a jury instruction on the charge of involuntary manslaughter by wanton or reckless conduct, and adequately supported the defendant's conviction of that charge, where the Commonwealth's emphasis at trial on the three charges of homicide by intentional battery (murder in the first degree, murder in the second degree, and involuntary manslaughter by battery) did not eliminate the charge of involuntary manslaughter by wanton or reckless conduct, given that the trial judge maintained it as a viable alternative charge throughout the trial by accurate instructions to the jury [405-407]; where evidence of the defendant's undisputed violation of statutory and regulatory standards for the operation of her day care facility, as well as the continuation, repetition, and magnitude of those safety infractions, supported the finding that the overextended and undersupervised operation of the defendant's home day care center had reached a degree of wanton or reckless conduct creating a high likelihood of substantial harm to one or more children in her care, especially the infants [407-409]; and where the jury were free to accept the opinion of the defendant's expert witness that an older child or children could have caused the victim's death, an explanation that would shield the defendant against the charges of homicide by intentional battery, but permit her conviction of the wanton or reckless conduct charge [409-410].

INDICTMENT found and returned in the Superior Court Department on September 9, 2003.

The case was tried before *Peter M. Lauriat,* J.

*J.W. Carney, Jr.,* for the defendant.

*Marguerite T. Grant,* Assistant District Attorney (*K. Nathaniel Yeager,* Assistant District Attorney, with her) for the Commonwealth.

SIKORA, J. As the result of the death of an infant from injuries suffered in her family day care home, a Superior Court jury convicted the defendant, Ann Power, of involuntary manslaughter by reason of wanton or reckless conduct. Upon medical evidence of shaken baby syndrome, the Commonwealth had pressed the case to the jury upon additional theories of murder in the first and second degrees and of involuntary manslaughter by battery. The trial judge instructed the jury upon all four theories of homicide and included each in the verdict slip. The jury acquitted the defendant of both degrees of murder and of involuntary manslaughter by battery. On appeal the defendant contends (1) that the judge's instruction on the definition of wanton or reckless conduct was insufficient and (2) that the Commonwealth's evidence failed to support the jury's finding of such conduct. For the following reasons we affirm the judgment of conviction.

*Procedural history.* A grand jury returned two indictments charging that, on June 4, 2003, the defendant had murdered a three month old infant, Mackenzie Rose Corrigan (the victim or Mackenzie) and had operated an unlicensed family day care home in violation of statutory requirements.[1] The defendant pleaded guilty to operation of a family day care home without a license. Trial began on January 18, 2006, and extended for fourteen days from empanelment through final deliberation.

After discussion with counsel and before the commencement of evidence, the judge preliminarily instructed the jury upon the definitions of murder in the first and second degrees, involuntary manslaughter by battery, and involuntary manslaughter by wanton or reckless conduct. Defense counsel objected to the inclusion of the instruction upon involuntary manslaughter by wanton or reckless conduct on the grounds that the indictment and the Commonwealth's intended proof and argument confined its theory to homicide by intentional battery.

At the close of the Commonwealth's evidence, the judge denied the defendant's motion for a required finding of not guilty of involuntary manslaughter by wanton or reckless conduct. The defendant renewed the motion at the close of all evidence. The

---

[1]General Laws c. 28A, § 11(*a*), prohibits the conduct of a family day care home without a license. General Laws c. 28A, § 15, authorizes punishment for violation of the licensure requirement by a fine of up to $1,000 or by imprisonment for not more than six months, or both.

judge again denied it. The defendant objected to the inclusion of the offense of involuntary manslaughter by wanton or reckless conduct in the judge's final instruction and, by necessary implication, in the verdict slip.

After the return of the verdict of guilt upon that charge, the defendant renewed the motion for a required finding of not guilty pursuant to Mass.R.Crim.P. 25(b)(2), 378 Mass. 896 (1979); the judge denied it. The present appeal ensued.

*Factual background.* The evidence permitted the following findings.

1. *The undisputed history of the defendant's family day care service.* The defendant had begun to mind children in her home in or about 1970. From that time until 2003, she had cared for children ranging in age from two months to school age and ranging in number from eight to fourteen at a given time. She had never advertised, but had received clients from relatives and friends and by word of mouth. In 1984, the Massachusetts Office for Children licensed her to operate a day care facility in her home. Licensure authorized her to care for six children. In April of 1994, an investigator made an unannounced visit and found fourteen children present. The agency[2] imposed an emergency suspension and several months later a final decision of refusal to renew her license.

In January of 1995, the investigator made another unannounced visit and discovered the defendant to be caring for six children, three of whom were less than one year old. State regulations then prohibited a provider from caring for more than two children under the age of fifteen months at one time. The agency issued a cease-and-desist order against the defendant.

In October of 1995, another investigator found the defendant to be caring for nine children, four of whom were less than two years old. State regulations limited licensed providers to care for no more than a total of six children and for no more than three children under the age of two. As a result of a return visit in September, 1996, the investigator suspected the defendant to

---

[2]Since 1994, the Legislature has renamed the Office for Children, first, as the Office of Child Care Services, see G. L. c. 28A, § 3, and, later, as the Department of Early Education and Care. G. L. c. 15D, § 2. We shall refer to the licensing and supervising authority generally as the "agency."

be in violation of the cease-and-desist order. In May, 1997, the agency issued a second cease-and-desist order.

The defendant resumed child care after receipt of the second cease-and-desist order. Over three days in May of 1997, investigators monitored the defendant's home and observed four adults leave children in the morning and retrieve them in the afternoon. In June, the agency issued a third cease-and-desist order. The defendant nonetheless resumed and continued child care from at least 2001 to June, 2003. In 2003, she usually cared for twelve to fourteen children per day.[3]

2. *The events of June 4, 2003.* On that day, the defendant had fourteen children in her care: four infants one year of age or less[4]; four toddlers between the ages of one year and three months to two years and eight months[5]; and six preschoolers between the ages of three years and five months to six years and six months.[6] She was the lone care giver throughout the day. As a policy she kept the older children separate from the infants and instructed them not to approach the younger children. She punished any hitting by the older children by warnings and confinement to a time-out chair.

The father of MacKenzie delivered her older brother (age three years and five months) and her to the home at about 6:40 A.M. The defendant distributed the children between three first-floor rooms: the kitchen, an adjacent play room, and a farther toy room. The defendant could not see the play room or the toy room from the kitchen. At about 9:30 A.M., the defendant fed and changed MacKenzie. She then fed the children lunch by shifts in the kitchen. Shortly after 11:30 A.M., she brought the preschoolers into the kitchen and placed MacKenzie in the family room in a car seat with three other infants and two toddlers. After the older children had finished lunch, she sent them to the

---

[3]The defendant testified that, throughout the period from 1994 onward, she had advised parents of her unlicensed status.

[4]The infants were ages two months, three months (the victim), five months, and nine months.

[5]The toddlers were ages one year and three months, one year and eleven months, two years and one month, and two years and eight months.

[6]The preschoolers were ages three years and five months, three years and ten months, three years and eleven months, four years and three months, five years and eight months, and six and one-half.

family room with the infants and brought the toddlers into the kitchen for lunch. As a third shift, she fed one or more of the infants in place in the family room. At that time, shortly before noon, the victim appeared to be sleeping in her car seat in the family room. The defendant then sent the preschoolers into the backyard to play.

At approximately 12:30 P.M., the defendant went from the kitchen to the family room, lifted MacKenzie from the car seat in order to feed her, and found her limp, unresponsive, and breathing with difficulty. For five to ten minutes, the defendant walked and massaged the victim, moistened her face, neck, and upper body, and performed cardiopulmonary resuscitation. She then made a 911 call for help. Within three to five minutes an emergency medical technician arrived, treated the victim, and removed her.

The emergency service brought the victim to the nearest community hospital. She remained unresponsive, unconscious, and unable to breathe independently. She was transferred during the afternoon to Children's Hospital in Boston. Late the following day, after consultation with an attending physician, the family withdrew her life support equipment.

3. *Trial positions*. At trial the Commonwealth's primary theory was that the defendant had violently shaken the victim so as to cause concussive brain injury and death. It offered in evidence the opinion of the board-certified pediatrician who had examined the victim upon arrival at Children's Hospital and who concluded that she had died from brain injuries inflicted by violent shaking. That physician opined also that a child of seven years or younger could not have the strength to lift and shake an infant with enough force to inflict such injuries. She had never seen such injuries result from a shaking in a car seat.

Also in support of the Commonwealth's position, an ophthalmologic pathologist testified that he had examined the victim's eyes after death and found extensive bleeding in both retinas. He characterized that finding as distinctive evidence of violent shaking.

The medical examiner performing the autopsy also concluded, from her observation of bleeding in the brain and the eyes, that violent shaking had caused fatal brain damage.

A fourth physician, a pediatrician, experienced in the study of shaken baby syndrome, informed the jury that brain dysfunction,

subdural bleeding, and retinal hemorrhaging were characteristic injuries of a shaken baby. She acknowledged that other indicia of shaken baby syndrome were absent in this case: long bone fractures in the arms and legs, and rib and spinous fractures. She explained that infants are especially susceptible to brain damage from shaking because their disproportionately large heads and weak neck muscles permit violent fluctuation of the skull and concussive impact of the brain against the skull. This physician also believed that a six year old child could not lift an infant and shake the victim with sufficient force to cause such injury.

The defendant contended that an older child or children could have performed the shaking. She submitted expert testimony of a biomechanical engineer. On the basis of experiments videotaped and shown to the jury, he concluded that a six year old child could so violently rock a car seat containing an infant for ten to fifteen seconds as to create the risk of brain injury equivalent to the risk caused by free-handed shaking of the infant by an adult woman for the same span of time. By cross-examination and by rebuttal from its fourth physician (one of its pediatric experts), the Commonwealth challenged the reliability of the biomechanical experiments and resulting data.

In closing argument, defense counsel challenged the strength of the Commonwealth's evidence of any shaking of the victim by the defendant and called the jury's attention to medical testimony of the vulnerability of an infant's brain to trauma and to the opportunity of another child or children to have shaken the victim's car seat. He characterized that occurrence as an unforeseeable tragedy beyond the fault of the defendant.

In his summation, the prosecutor attacked the theory of violent shaking of the car seat by another child, attributed the victim's death to an intentional battery by the defendant, and urged the jury to find the defendant guilty of murder.

In a sidebar conference immediately after the closing arguments, defense counsel requested the judge to exclude the theory of involuntary manslaughter by wanton or reckless conduct because the Commonwealth's evidence and argument had focused upon homicide by intentional battery and because the inclusion of the charge of wanton or reckless conduct would invite jury confusion and compromise. The prosecutor insisted upon inclusion of

the charge because the Commonwealth was not waiving it, but was seeking conviction of murder as the most serious offense permitted by the evidence. The judge chose to retain the charge in the instruction and verdict slip, and preserved the defendant's right to request judgment of acquittal notwithstanding the verdict. In the course of instructions, the judge advised the jury that the offenses of involuntary manslaughter by battery and involuntary manslaughter by wanton or reckless conduct were mutually exclusive.

*Discussion.* 1. *The instruction upon the charge of involuntary manslaughter by wanton or reckless conduct.* The judge instructed the jury in compliance with the Supreme Judicial Court's Model Jury Instructions on Homicide (1999), defining the crime as "an unlawful killing unintentionally caused by wanton or reckless conduct creating a high degree of likelihood that substantial harm will result to another." *Id.* at 34. He informed the jury, "The essence of wanton or reckless conduct is intentional conduct which either the defendant knew or a reasonable person would have known involved a high degree of likelihood a substantial harm would result to another even though the harm itself may not have been intended." At the charge conference, the defendant had proposed an instruction addressing the subject of the foreseeability of substantial harm:

> "The cause of the injuries which led to the death must have been foreseeable to the defendant or to a reasonable person in the defendant's position. In other words, the Commonwealth must prove beyond a reasonable doubt that it was foreseeable that Mackenzie Rose Corrigan would suffer the injuries and in the manner in which she suffered them."

The judge declined to adopt this additional language and chose instead to "stick with the model instruction in that area."

That ruling was correct. To be entitled to a requested instruction, a party must show an evidentiary basis supporting it. For that purpose the judge must view the evidence in the light most favorable to the proponent of the instruction. See *Commonwealth v. Cook,* 419 Mass. 192, 201 (1994), and cases cited, and *Commonwealth v. Consoli,* 58 Mass. App. Ct. 734, 736 n.5 (2003). The Massachusetts doctrine of involuntary manslaughter by

wanton or reckless conduct has not required specific foresee-ability of the manner of harm or death. The major cases have never imposed proof of such specificity upon the Commonwealth, even though the circumstances in particular instances may make obvious the nature of danger to a potential victim. See *Commonwealth* v. *Welansky*, 316 Mass. 383, 397-401 (1944) (night-club owner's failure to provide safe fire exits resulted in death of hundreds of patrons); *Commonwealth* v. *Gallison*, 383 Mass. 659, 665-666 (1981) (parent's failure to seek medical care for gravely ill child); *Commonwealth* v. *Twitchell*, 416 Mass. 114, 117-118 (1993) (failure of parents to seek medical attention for child); *Commonwealth* v. *Crawford*, 430 Mass. 683, 691 (2000) (prosecution need not show defendant's awareness of probable specific victim). In particular, the decision in *Commonwealth* v. *Levesque*, 436 Mass. 443, 449-453 (2002), demonstrates the permissibly general nature of the element of substantial harm to the victim, the likelihood of which would provide the basis for conviction of manslaughter by wanton or reckless conduct. The defendants accidentally sparked a fire in a vacant warehouse and left the building without reporting it. In response to the ensuing conflagration, six firefighters died. *Id.* at 445-447. The response of the fire department was foreseeable, but the specific harm to its members was not. As matter of law, the defendants remained indictable. *Id.* at 451-453.[7]

2. *The sufficiency of the evidence.* The defendant argues also that the evidence supported neither the instruction nor the verdict upon involuntary manslaughter by wanton or reckless conduct. She appeals from the overruling of her objection to the inclusion of the instruction and to the verdict slip question; and from

---

[7]The court in *Levesque*, 436 Mass. at 453, concluded its discussion with the following language:

> "The defendants also assert that their conduct could not have been reckless because it was unforeseeable that such grievous harm would result to the fire fighters who responded. . . . However, an uncontrolled fire is inherently deadly to all who may come into contact with it, whether fire fighters or ordinary citizens. The defendants are charged with this knowledge."

The concern of the law with the mental state of the defendant has centered on the act or omission generating danger. "What must be intended is the conduct, not the resulting harm." *Commonwealth* v. *Welansky*, 316 Mass. at 398.

the denial of her motion at the close of the Commonwealth's evidence and the close of all the evidence for a required finding of not guilty upon the charge. Mass.R.Crim.P. 25(a) & (b), 378 Mass. 896 (1979). For the following reasons the evidence permitted the instruction and the verdict.

In review of a ruling upon a motion for a required finding of not guilty, we examine the evidence in the light most favorable to the Commonwealth to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979). To satisfy that standard, the Commonwealth may rely on reasonable inferences drawn from circumstantial evidence. *Commonwealth* v. *Arroyo*, 442 Mass. 135, 140 (2004). The inferences need only be reasonable and possible, not necessary or inescapable. *Commonwealth* v. *Merola*, 405 Mass. 529, 533 (1989). Circumstantial evidence alone may be sufficient to meet the *Latimore* standard. *Commonwealth* v. *Rojas*, 388 Mass. 626, 629 (1983). The analysis asks not whether the evidence compels a finding of guilt, but rather whether it permits such a finding beyond a reasonable doubt. *Commonwealth* v. *Platt*, 440 Mass. 396, 400-401 (2003).

An important first observation is that the Commonwealth's emphasis upon the three charges of homicide by intentional battery (murder in the first degree; murder in the second degree; involuntary manslaughter by battery) did not eliminate the fourth charge because the trial judge maintained it as a viable alternative throughout trial by accurate instructions to the jury.[8] In preliminary instructions, he defined the offense of involuntary manslaughter by wanton or reckless conduct. In the course of evidence, after the defendant's testimonial acknowledgment of the emergency suspension, the nonrenewal of licensure, and the three cease-and-desist orders, the judge gave a cautionary instruction to the jury: "[Y]ou may consider any such evidence [the suspension, nonrenewal, and three subsequent agency orders] of those

---

[8]Despite the prosecutor's emphatic preference for the theories of battery by the defendant, he never waived the underemphasized alternative. The tension between the first three theories (battery by the defendant) and the fourth (unsupervised shaking of the infant victim's car seat by an older child or children) dictated the Commonwealth's strategic choice. In the assessment of a jury, any increased emphasis upon the fourth charge would most likely have subtracted strength from the first three.

past actions [violations of those sanctions] solely on the limited issue of Ms. Power's knowledge that overenrollment may have created a risk of harm to children in her care." In the final charge to the jury, the judge delivered the definition of the offense from the Supreme Judicial Court's Model Jury Instructions on Homicide, and repeated the quoted description of the probative role of the safety standard violations. Therefore, before, during, and after the presentation of evidence, the jury received guidance about the alternative offense, could receive and organize evidence under its definition, and could cure any confusion resulting from the prosecutor's alternative emphasis.

Evidence of the defendant's undisputed violation of statutory and regulatory standards supported the finding of wanton or reckless conduct creating a high likelihood of substantial harm to one or more children in her care. The purpose of the statutory licensure program for day care facilities is the protection of children from abuse or neglect. See G. L. c. 28A, § 1; 102 Code Mass. Regs. § 8.13(6)(a) (1997). The statutory scheme criminalized unlicensed operation by fine (up to $1,000), confinement (up to six months), or both. See G. L. c. 28A, §§ 11(*a*), 15. Violation of such safety standards does not, by itself, amount to wanton or reckless conduct. See *Commonwealth* v. *Welansky*, 316 Mass. at 403; *Commonwealth* v. *Godin*, 374 Mass. 120, 129 (1977). However, it can with other evidence contribute to such a finding if the resulting harm falls within the purpose of the safety provision. *Commonwealth* v. *Welansky*, *supra*. In addition to the documentary exhibits evidencing the sanctions of emergency suspension, nonrenewal of licensure, and three cease-and-desist orders, the defendant conceded under cross-examination that she had continued to resume operation after those sanctions even though she understood that the governing State agency regarded her activity as unsafe for the children.[9]

---

[9]The cross-examination of the defendant included the following segment:

> *Q:* "So the Office for Child Care Safety notified you on April 14 of 1994 of an emergency suspension?"
>
> *A:* "Yes."
>
> *Q:* "You knew when they notified you of the emergency suspension they were shutting you down because they had found that you had violated the rules?"

The jury were entitled to consider also the continuation, the repetition, and the magnitude of the safety infractions. They

A: "Correct."

Q: "And you knew the rules existed to protect the children in your care?"

A: "Yes."

Q: "You knew that they existed to limit the total number of kids that any day care provider was permitted to have?"

A: "Yes."

Q: "And they do that for two reasons. One, so that you are physically capable of managing all the kids there. Fair to say?"

DEFENSE COUNSEL: "Objection."

THE COURT: "If you know, you may answer. Overruled."

A: "Yes."

Q: "You are also limited because, as you knew, the government had set a limit because no single person is capable of caring for that many children?"

DEFENSE COUNSEL: "Objection."

THE COURT: "Overruled. If you know, you may answer; if not, you may say so."

A: "That's what they said, yes."

Q: "No single person can handle the stress of caring for that many children?"

A: "That's what they said."

Q: "And 'they,' just to be clear, are the Commonwealth of Massachusetts?"

A: "Correct."

Q: "And they notified you of the rules with the emergency suspension of your license?"

A: "Correct."

Q: "Now they notified you again of the rules with [the 1994 notice of refusal to renew licensure], correct?"

A: "Yes."

Q: "And that was the final suspension of your license; is that correct?"

A: "Yes, it was."

extended from 1994 to 2003; the defendant disregarded at least four administrative orders issued (and never withdrawn) during the span from 1994 to mid-1999. The scale of the violations was substantial and not marginal. While regulation limited a licensed facility to six children, and not more than three of them under two years of age, the defendant's unlicensed facility maintained twelve to fourteen children, of whom four were infants under one year of age and two more were under two years of age on the day of the victim's injury. The excessive number of infants particularly heightened the risk of a mishap by reason of their general helplessness and their particular vulnerability to head trauma. The evidence showed that the defendant could not simultaneously monitor all the children and that older children could mingle with the infants. The jury could find that the over-extended and undersupervised operation of the defendant's home day care center had reached a degree of wanton or reckless creation of a high likelihood of substantial harm to the children, especially the infants.[10]

Finally, the jury were free to accept the opinion of the defendant's biomechanical expert that an older child or children could have violently rocked the victim's car seat and caused her death. That explanation would shield the defendant against the first three charges of homicide by intentional battery, but expose her to the fourth charge of wanton or reckless conduct by enabling older children in an overcrowded day care home to have unsupervised access to vulnerable infants.[11] The defense to the

---

*Q:* "But you went back and began providing care once again?"

*A:* "Yes, I did."

*Q:* "You did that knowing that what you were doing was deemed to be dangerous by the government?"

*A:* "By the government it was."

[10]The defendant's explanation that she informed parents of her unlicensed status and that they nonetheless requested her services does not constitute justification for violation of the administrative orders or a defense to the charges.

[11]The evidence imposed reciprocal tactical dilemmas for opposing counsel. The prosecutor could not aggressively pursue the fourth charge without weakening the three primary charges. The defendant's counsel had to pursue the theory of an intervening older child or children as a defense to the first three charges at the cost of exposure to the fourth.

first three charges inevitably provided support for the fourth.[12]

*Conclusion.* We therefore affirm the conviction.

*Judgment affirmed.*

---

[12]We treat the defendant's appeal from the denial of the motion for a required finding of not guilty at the conclusion of the evidence as an appeal also from the defendant's posttrial renewed motion for a required finding. We agree with the judge's concise reasoning for denial:

"In the present case, the defendant operated a child day care facility in her private home for as many as fourteen children for nearly 10 years after she was issued a Notice of Emergency Suspension of her licence to operate her facility in 1994 for her failure to comply with the applicable statutes and regulations, thereby endangering the life, health and safety of the children in her care. The defendant continued to operate her child care facility after her license was ultimately revoked, and despite at least three subsequent cease-and-desist orders issued to her for doing so without a licence, all prior to June 4, 2003, when three month old MacKenzie Rose Corrigan was grievously injured while at the defendant's child day care facility and died the following day. These affirmative actions by the defendant, when viewed by a reasonable person in similar circumstances, are sufficient to support the jury's verdict of guilty of involuntary manslaughter by wanton and reckless conduct. [*Commonwealth* v. *Welansky*, 316 Mass. at 398-399]. *Commonwealth* v. *Levesque*, 436 Mass. [at 452]."