The ESTATE of Debra DAVIS, by Olga DAVIS, in her capacity as Administratrix of the Estate of Debra Davis, Plaintiff,

v.

The UNITED STATES of America, et al., Defendants.

No. CIV.A. 02–11911–RCL.

United States District Court, D. Massachusetts.

Oct. 15, 2004.

Paul J. Griffin, Christopher M. Sheehan, Milton, MA, Robert S. Sinsheimer, Susan E. Sivacek, Sinsheimer & Associates, Boston, MA, for Plaintiffs.

Stacey Bosshardt, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, William A. Brown, Boston, MA, Katherine A. Carey, Torts Branch, Civil Division, U.S. Department of Justice, Washington, DC, Catherine J. Finnegan, U.S. Department of Justice, Washington, DC, Margaret Krawiec, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, Edward J. Lonergan, Boston, MA, A. Douglas Matthews, Fall River, MA, E. Peter Mullane, Mullane, Michel & McInnes, Cambridge, MA, E. Peter Parker, One Commercial Wharf North, Boston, MA, Peter Schlossman, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, Tory A. Weigand, Morrison, Mahoney & Miller, LLP, Springfield, MA, for Defendants.

Dean A. Mazzone, Attorney General's Office, Boston, MA, for Attorney General of Massachusetts, District Attorneys for the Suffolk, Norfolk, and Middlesex Districts of Massachusetts, Interested Partys.

## MEMORANDUM ON THE MOTION OF THE UNITED STATES TO DISMISS

LINDSAY, District Judge.

### I. INTRODUCTION

This action arises out of the circumstances surrounding the death of Debra Davis ("Davis") in September 1981, allegedly at the hands of Stephen J. Flemmi and James J. Bulger. At the time of Davis's death, Flemmi and Bulger were "top echelon" informants for the Federal Bureau of Investigation (the "FBI") and alleged leaders of the Boston area's Winter Hill Gang, an association of individuals engaged in criminal activities. In counts I through VI of her amended complaint, Olga Davis (the "plaintiff"), adminstratrix of the Estate of Debra Davis (the "Estate"), claims, *inter alia*, that the United States (sometimes hereinafter referred to as the "government") and others wrongfully caused Davis's death by permitting Flemmi and Bulger to commit criminal activities with impunity, including murdering Davis and others.

█ The claims against the government purport to have been brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2401, 2671, *et seq.* The plaintiff, in substance, asserts that the government failed in its duty to warn and protect Davis from wrongful acts committed against her by the government's informants, Flemmi and Bulger. Tort claims

for damages against the United States may be maintained only to the extent that sovereign immunity is waived by the FTCA. *Wood v. United States,* 290 F.3d 29, 35 (1st Cir.2002). Subject to certain requirements, the FTCA permits civil actions against the government for injuries caused by the wrongful conduct of any employee of the government, acting within the scope of his or her employment, under circumstances in which a private person would be liable to the claimant. 28 U.S.C. § 1346(b). The government has moved under Fed.R.Civ.P. 12(b)(1) to dismiss all of the claims against it, arguing that the court lacks subject matter jurisdiction over the claims because (1) the plaintiff failed to present her administrative claim to the appropriate federal agency within two years of the accrual of that claim; (2) the conduct upon which the claims are based was committed by FBI agents acting outside of the scope of their employment; (3) the alleged failure of the United States to warn or protect Davis is not actionable under state law; and (4) the alleged failure to warn or protect Davis falls within the discretionary function exception of the FTCA.

On March 31, 2004, I entered an electronic order denying the motion of the United States to dismiss. This memorandum sets forth the reasons for that ruling.

## II. BACKGROUND AND LEGAL STANDARD

Except for the allegations specifically mentioning Davis, most of the allegations in the lengthy amended complaint were drawn from the findings of fact in *United States v. Salemme,* 91 F.Supp.2d 141 (D.Mass.1999) (Wolf, J.), *rev'd in part on other grounds by United States v. Flemmi,* 225 F.3d 78 (1st Cir.2000), *cert. denied,* 531 U.S. 1170, 121 S.Ct. 1137, 148 L.Ed.2d 1002 (2001). In brief, the amended com-

plaint alleges that in the late 1970's, the FBI recruited Flemmi and Bulger as "top echelon" informants to investigate, arrest, and prosecute members of La Cosa Nostra ("LCN," sometimes known as the "Mafia"), a criminal organization that was a rival to the Winter Hill Gang. The FBI allegedly agreed that, in exchange for the information Flemmi and Bulger provided, the FBI would protect the gangsters from prosecution for their criminal activities. In fulfillment of this promise, the FBI not only failed to take action when it discovered that Flemmi and Bulger were committing crimes, including murder, but the FBI also allegedly helped Flemmi and Bulger evade investigation and prosecution by other law enforcement agencies. This protection was accomplished through the conduct of FBI agent John J. Connolly, Jr., the "handler" of Flemmi and Bulger, as well as through John Morris, Connolly's immediate supervisor, and other supervisory agents. The plaintiffs allege that the protection afforded Flemmi and Bulger by FBI agents allowed the two criminals to kill Davis in 1981, without fear of prosecution, after the twenty-six year old Davis had announced to Flemmi that she wanted to end their relationship of approximately nine years. In or about October 2000, a former member of the Winter Hill Gang disclosed the location of Davis's remains to law enforcement officers.

 In considering the government's motion to dismiss for lack of subject matter jurisdiction, I may "accept[ ] the plaintiff's version of jurisdictionally-significant facts as true" and "assess whether the plaintiff has propounded an adequate basis for subject matter jurisdiction." *Valentin v. Hospital Bella Vista,* 254 F.3d 358, 363 (1st Cir.2001). In performing this analysis, I must "credit the plaintiff's well-pleaded factual allegations (usually taken from the complaint, but sometimes aug-

mented by an explanatory affidavit or other repository of uncontested facts), draw all reasonable inferences from them in her favor, and dispose of the challenge [to subject matter jurisdiction] accordingly." This approach to resolving the jurisdiction question is called the sufficiency challenge. *Id.* at 363. On the other hand, "the plaintiff's jurisdictional averments are entitled to no presumptive weight" where a party challenges subject matter jurisdiction "by controverting the accuracy (rather than the sufficiency) of the jurisdictional facts asserted by the plaintiff and proffering materials of evidentiary quality in support of that position." *Id.* In those circumstances, "the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties." *Id.* When the genuinely disputed jurisdictional facts are "inextricably intertwined with the merits of the case," I may "defer resolution of the jurisdictional issue until the time of trial." This approach is called the factual challenge. *Id.*

In considering the present motion, I have employed the "sufficiency challenge" approach. In its motion to dismiss, the government has not controverted the factual allegations of the plaintiff. Moreover, the disputed facts relevant to subject matter jurisdiction are too numerous and, for the most part, too "inextricably intertwined with the merits of the case," to make a "factual challenge" to subject matter jurisdiction practicable.

## III. DISCUSSION

### A. Timely Presentation of Administrative Claim

■ The FTCA requires that prior to filing suit, the plaintiff must present an administrative claim to the relevant federal agency (here, the FBI) within two years of the date the claim accrued. 28 U.S.C. § 2401(b). Where a claim does not meet this requirement, the court does not have jurisdiction to entertain the claim and must dismiss it. *Skwira v. United States,* 344 F.3d 64, 71 (1st Cir.2003), *cert. denied,* —— U.S. ——, 124 S.Ct. 2836, 159 L.Ed.2d 267 (2004). The United States asserts that the plaintiff's claims against the United States accrued more than two years before she presented her administrative claim to the government on September 17, 2001. The plaintiff argues that her claim could not have accrued prior to October 2000, when Davis's remains were discovered.

■ I have addressed the law pertaining to the accrual of actions under the FTCA in some detail in cases raising claims similar to those raised in this case. *See Donahue v. Federal Bureau of Investigation,* 204 F.Supp.2d 169 (D.Mass.2002); *Bennett ex rel. Estate of Bennett v. Federal Bureau of Investigation,* 278 F.Supp.2d 104 (D.Mass.2003); *Wheeler v. United States,* C.A. No. 02–10464–RCL (D.Mass. Mar. 31, 2003), *aff'd by McIntyre v. United States,* 367 F.3d 38 (1st Cir.2004); *Callahan v. United States,* 337 F.Supp.2d 348 (D.Mass.2004); and *Barrett v. United States,* 337 F.Supp.2d 370 (D.Mass.2004). In these cases, I concluded that, in the First Circuit, which applies a discovery rule with respect to the application of the statute of limitations in actions brought pursuant to the FTCA, "a claim accrues when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the factual basis for the cause of action." *Gonzalez v. United States,* 284 F.3d 281, 288 (1st Cir.2002).[1] Outside of

---

1. After my decisions in *Bennett, Donahue,* and *Wheeler* and after the parties in this case briefed the statute of limitations issue, the

First Circuit dispelled any remaining doubt that the discovery rule applies to all FTCA claims— not just those for medical malprac-

the medical malpractice context, the "factual basis" for an FTCA claim is "(1) the fact of injury and (2) the injury's causal connection with the government." *Skwira,* 344 F.3d at 77.

Based on the record before me, and treating the plaintiff's well-pleaded facts with the requisite level of indulgence, I conclude that it was not unreasonable for the plaintiff to have failed to discover the factual basis of her claims until Davis's remains were discovered in October 2000. For this reason, which is explained more fully in my order in this case denying the motions of the individual defendants to dismiss based on the statute of limitations (docket no. 74), I denied the motion of the United States to dismiss based on the statute of limitations.

## B. Composite Nature of Plaintiff's Claims

I also denied the United States' motion to dismiss because the government's discrete theories of non-liability are inconsistent with and not sustainable in light of the composite nature of the plaintiff's claims.

Count I summarizes and catalogs the alleged misconduct of the government that led to Davis's murder:

The defendant United States and its agency, the Federal Bureau of Investigation negligently continued to utilize Bulger and Flemmi as top echelon informants; negligently failed to control the criminal activities of Bulger and Flemmi, negligently failed to enforce the Attorney General Guidelines governing high echelon informants, including Bulger and Flemmi; negligently and in violation of the regulations and policies of the defendant United States failed to inform the appropriate law enforcement or pro-

secutive authorities of the criminal activities of Bulger and Flemmi; negligently failed to properly supervise federal agents, including Connolly and Morris, in their handling of Bulger and Flemmi; negligently continued to allow Connolly to remain Bulger and Flemmi's "handler" when it was known or should have been known that he should have been removed from that position;[ ] negligently failed to warn and protect Davis; and negligently failed to investigate for the purpose of prosecution the circumstances of Davis'[s] disappearance and death.

As a result of these wrongful acts . . . events occurred that a reasonable, prudent person would have foreseen in light of the circumstances set forth herein, including the kidnapping, torture and wrongful death of Debra Davis.

Amend. Compl. ¶¶ 236, 237. The same allegations are repeated explicitly or by incorporation in counts II through VI. *Id.* ¶¶ 239–266.

Although each of counts I through VI alleges that the liability of the government for the death of Davis is premised on a series of wrongful acts or omissions, the government has moved to dismiss these claims on the basis that the government has not waived its sovereign immunity as to certain discrete acts of alleged misconduct. The government's attack on the plaintiff's claims is several-fold. It argues that, because federal statutes and regulations do not authorize FBI agents to grant immunity to informants, any conduct of the FBI agents to shield Bulger and Flemmi from prosecution was outside of the scope of the agents' authority and therefore not actionable under the FTCA. The govern-

tice. *Skwira v. United States,* 344 F.3d 64, 74–75 (1st Cir.2003); *see also Cascone v. United States,* 370 F.3d 95, 104 (1st Cir.2004).

ment also maintains that any claim based on its alleged failure to protect Davis is "jurisdictionally barred because a private individual would not be liable under analogous circumstances under state law." Mem. Supp. U.S. Mot. Dismiss at 25. The government finally contends that "insofar as [the plaintiff's claims] are based on a failure to protect the decedent from being harmed by Flemmi or Bulger," the claims are prohibited under the discretionary function exception to the FTCA. *Id.* at 23.[2]

The government has correctly identified the parameters of the limited waiver of sovereign immunity afforded under the FTCA. The government has not waived its sovereign immunity where the misconduct in question is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government." 28 U.S.C. § 2680(a); *Muniz–Rivera v. United States*, 326 F.3d 8, 17 (1st Cir.2003) (upholding dismissal of FTCA claim for lack of subject matter jurisdiction under the "discretionary function" exception), *cert. denied*, —— U.S. ——, 124 S.Ct. 224, 157 L.Ed.2d 134 (2003). The court therefore does not have subject matter jurisdiction of claims based on such alleged misconduct. The same is true where the injury complained of is not "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the

United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

In this case, however, the alleged misconduct cannot be so easily compartmentalized. As a practical matter, dismissal based on the grounds suggested by the government would be logistically problematic where sovereign immunity has been waived as to some acts and omissions claimed by the plaintiff, but not as to others. Thus, because the government has not addressed all of the asserted grounds for liability within each claim, I cannot grant its motion wholesale; nor can I consider dismissal on a count by count basis.

More importantly, though, the government's method of attacking the legal sufficiency of the plaintiff's claims misses the mark. The plaintiff's claims against the United States do not simply arise from an ineffective promise of immunity or a particular decision not to protect or warn an individual. Instead, the plaintiff alleges that for decades, the FBI allowed—— and in some instances even encouraged—— Flemmi and Bulger to commit murder and other serious crimes. Flemmi and Bulger were allegedly able to carry out these criminal activities because the FBI used deception and its political weight effectively to insulate the two alleged gangsters from prosecution by other federal and state law enforcement authorities. Ac-

---

2. In addition, the government argues that the claims based on the government's alleged failure adequately to investigate Davis's death should also be dismissed under the discretionary function exception. Counts I through VI are for the "kidnapping, torture, and wrongful death of Debra Davis." Amend. Compl. ¶¶ 237, 240, 245, 249, 262, 265. It is factually impossible, however, for the government's conduct after Davis's death to have contributed to her murder, and any allegations in

counts I through VI pertaining to government responsibility for events occurring after the alleged murder are necessarily beyond the scope of any cognizable claim against the United States. Consequently, I will not address whether the discretionary function exception applies to this aspect of the plaintiff's claims. That some allegations are insufficient in themselves to state a claim does not mean, however, the claim fails as a whole.

cording to the picture painted by the plaintiff, the FBI carried out its practice of protecting Flemmi and Bulger without any real regard to the foreseeable trail of victims, including Davis. The plaintiff alleges that the institutional culture of doing whatever was necessary to protect Flemmi and Bulger affected numerous practices and spheres of responsibility within the FBI. The fact that the plaintiff has alleged that the government breached a variety of duties in a variety of ways is merely reflective of the alleged overlapping and interdependent causes of Davis's death. Therefore, the government cannot escape liability for the injuries caused by its alleged intercessions on behalf and encouragement of Flemmi and Bulger by merely arguing, for example, that the FBI agents did not have the authority to grant Flemmi and Bulger the type of immunity that would bar the government from prosecuting them. Similarly, even if a decision to warn or protect a citizen implicates the exercise of a governmental discretionary function, I will not partition allegations that the government's failure to protect Davis contributed to her death from allegations implicating other theories of liability. The government's attempt to dissect the plaintiff's claims into isolated pieces at this stage of the proceedings inappropriately eliminates the gestalt of the plaintiff's claim.

The government's approach is not unlike the one Judge Gertner addressed in *Limone v. United States,* 271 F.Supp.2d 345 (D.Mass.2003), *aff'd by Limone v. Condon,* 372 F.3d 39 (1st Cir.2004),[3] in which the government argued that allegations that FBI agents framed three innocent men for murder and allowed them to be wrongfully held in prison for decades were not actionable under the FTCA because, *inter alia,* the government's decisions about matters such as whom to prosecute, how to manage informants, and whether to disclose exculpatory evidence were "discretionary functions." 271 F.Supp.2d at 353. In a similar vein, the individual defendants in that case— former FBI agents— argued they were entitled to qualified immunity as to the plaintiffs' constitutional claims, because it was not "clearly established" at the relevant time that investigators were required to disclose exculpatory evidence. *Id.* at 365–66. Judge Gertner categorically rejected these propositions: "The defendants' voluminous motions to dismiss miss the forest for the trees. They argue over and over again that certain facts taken in isolation do not state actionable claims, ignoring the big picture." *Id.* at 349. Referring to the FTCA claims, she emphasized that "this case is about much more than the minutiae of discrete FBI decisions, viewed in isolation ...." *Id.* at 353. In response to the argument of the individual defendants that they were entitled to qualified immunity, Judge Gertner observed:

> While it may be true that the defendants could be entitled to qualified immunity for a narrow claim [for failure to alert a prosecutor or judicial officer of known exculpatory information], the allegations here are much broader. It would make little sense to strike individual allegations of non-disclosure since they are an integral part of the overall story.

*Id.* at 366.[4] Similarly, in this case it is inappropriate to anatomize and line-edit

---

**3.** The sole issue in this interlocutory appeal was the district court's denial of the motions of the individual defendants to dismiss constitutional claims based on qualified immunity.

**4.** For another example of a court declining to piecemeal a factually complicated theory of causation on a motion to dismiss, see *Liuzzo v. United States,* 508 F.Supp. 923 (E.D.Mich. 1981). In *Liuzzo,* the plaintiffs sought dam-

the plaintiff's claims as long as there are allegations supporting claims that bring the conduct of government employees within the ambit of the FTCA.

## C. The Government's Separate Defenses

I also denied the government's motion to dismiss because, even if the government had not piecemealed the plaintiff's claims, the defenses the government has raised are infirm as applied to the facts alleged in this case.

### 1. Scope of Employment

 The government argues that the plaintiff's claims are barred because they are not based on conduct within the scope of the FBI agents' employment. As noted above, the United States has not waived its sovereign immunity with respect to claims based on the conduct of federal employees acting outside of the scope of their office or employment. 28 U.S.C. § 1346(b). Whether an employee is acting within the scope of his employment is determined by the law of the state in which the relevant conduct occurred. *Aversa v. United States*, 99 F.3d 1200, 1209 (1st Cir.1996). Under Massachusetts law, "the common law test [of whether an employee acts within the scope of his/her employment] considers whether the act was in furtherance of the employer's work." *Clickner v. Lowell*, 422 Mass. 539, 542, 663 N.E.2d 852 (1996). "Factors to be considered include whether the conduct in question is of the kind the employee is hired to perform,

ages for the death of their mother, who was killed by gunfire coming from a car occupied by members of the Ku Klux Klan as she traveled in Alabama, participating in the 1965 Selma to Montgomery voting rights march. The plaintiffs sued the government under the FTCA, alleging that numerous instances of misconduct by the FBI in its use of an informant who was in the Klan car— including failing properly to train and supervise the informant and permitting the informant to participate in violent acts— caused the mother's death. On its motion to dismiss, the government argued that the plaintiffs' claims were barred because "the allegations made by plaintiffs all related to the exercise of discretionary judgment by the F.B.I." *Id.* at 930. The government asked the court to

> focus its attention with regard to this issue on only two aspects of [the informant]'s involvement in the F.B.I. [-] to the authorization he received on the morning of the murder from his contact agent to go along on the mission, and to the decision made by high officials to utilize informants to penetrate the Klan secrecy.

*Id.* The court refused to adopt the government's formulation of the relevant facts and legal theories: "[T]he court declines to accept this invitation for it is at once both too narrow and too broad, and would require that the court overlook specific allegations in the complaint concerning activities which are not barred by the discretionary function exception." *Id.*

*Pooler v. United States*, 787 F.2d 868 (3d Cir.1986), illustrates the other side of the same coin. In *Pooler,* the plaintiffs sought recovery under the FTCA for unlawful arrest and prosecution resulting from an allegedly substandard investigation into narcotics sales at a government hospital. In affirming the district court's dismissal of the case on the basis of the discretionary function exception, the court pointed out that dismissal might not have been proper if the plaintiffs' theory of causation had included allegations beyond those of a deficient investigation that made use of unreliable informants:

> If the issue was the use of an undercover agent or informant whose known tendencies toward violence suggested a risk of physical harm either to the targets of an investigation or to all bystanders, the case might well be different. In addition, if the complaint were that agents of the government in the course of an investigation had violated constitutional rights or federal statutes, the outcome would be different since federal officials do not possess discretion to commit such violations. *But when the sole complaint is addressed, as here,* to the quality of the investigation as judged by its outcome, the discretionary function should, and we hold, does apply.

*Id.* at 871 (emphasis added).

whether it occurs within authorized time and space limits, and whether it is motivated, at least in part, by a purpose to serve the employer." *Id.* at 542, 663 N.E.2d 852.

■ The scope of an employee's employment "is not construed restrictively," *id.* (quoting *Howard v. Burlington*, 399 Mass. 585, 590, 506 N.E.2d 102 (1987)), and it may extend beyond the employee's actual authority, *Howard*, 399 Mass. at 590, 506 N.E.2d 102. In *Howard*, for example, the court rejected the argument that a town chairwoman's scope of employment was determined solely by reference to her official duties as set forth in the town's by-laws: "We decline to adopt such a restrictive interpretation of the term for the purposes of G.L. c. 258, § 9.[5] Moreover, and contrary to the plaintiffs' assertion, it is ordinarily the actual and customary, rather than formally described, duties which determine scope of employment." *Id.; see also Giacomuzzi v. Klein*, 324 Mass. 689, 88 N.E.2d 548 (1949) (employee's unauthorized act of inviting dry cleaning customer to shop's back room to identify clothing was within the employee's scope of employment); *cf. Pelletier v. Federal Home Loan Bank of San Francisco*, 968 F.2d 865, 875 (9th Cir.1992) (holding that the district court, in granting the government's motion to dismiss FTCA claims, incorrectly applied "scope of authority" test instead of the broader "scope of employment" test). Forbidden and criminal acts may also be within the scope of employment. *See, e.g., Commonwealth v. Jerez*, 390 Mass. 456, 462, 457 N.E.2d 1105 (1983) (diplomat who assaulted police officer while diplomat was en route to an official function was acting within the scope of his "employment"); *Manning v. Grimsley*, 643 F.2d 20, 24–25 (1st Cir.1981) (reasonable jury could have found that pitcher who threw baseball at heckling crowd, thereby injuring the plaintiff, was acting within the scope of his employment); *Hobart v. Cavanaugh*, 353 Mass. 51, 52–53, 228 N.E.2d 439 (1967) (employee's assault and battery of garage owner who had failed to fill employer's trucks with gasoline was within the scope of his employment); *Rego v. Thomas Bros. Corp.*, 340 Mass. 334, 335, 164 N.E.2d 144 (1960) (in light of evidence indicating that employee assaulted plaintiff while in performance of his duty for the employer, the employer's motion for a directed verdict in the personal injury action arising from the assault was properly denied); *Levi v. Brooks*, 121 Mass. 501, 504 (1877) (master who orders servant to remove furniture from home of a debtor is liable for servant's willful assaults committed during the execution of the order and in furtherance thereof; "if the acts were done in the execution of the authority given by the master, and for the purpose of performing what he had directed, he was responsible, whether the wrong done was occasioned by negligence or by a wanton and reckless purpose to accomplish his business in an unlawful manner"); *see also* RESTATEMENT (SECOND) OF AGENCY § 230 (1958) ("An act, although forbidden, or done in a forbidden manner, may be within the scope of employment."); *id.* § 231 ("An act may be within the scope of employment although consciously criminal or tortious.").

Here, the government suggests that the scope of an FBI agent's employment is

---

5. M.G.L. ch. 258, § 9 permits public employers to "indemnify public employees from personal financial loss and expenses ... arising out of any claim, action, award, compromise, settlement or judgment by reason of an intentional tort, or by reason of any act or omission which constitutes a violation of the civil rights of any person." *Id.* (1984). The Massachusetts Tort Claims Act, M.G.L. ch. 258, "is modeled closely on the Federal Tort Claims Act." *Howard*, 399 Mass. at 589, 506 N.E.2d 102.

limited to the duties enumerated in applicable federal statutes and regulations[6] and that the conduct at issue was not "of the kind that the agents were hired to perform" because "FBI agents are not hired to protect informants from indictment or prosecution for murder." Mem. Supp. U.S. Mot. Dismiss at 18–19. The government maintains that "[n]ot only is the conduct outside the scope because the agents lack authority to immunize the informants, the conduct is such a startling and unexpected deviation from duty that it would be unfair to tax the agent's employer with the cost of its occurrence." *Id.* at 20.

While it is true, as the government argues, that in *United States v. Flemmi,* 225 F.3d 78, 86 (1st Cir.2000), the First Circuit held that the FBI's alleged promises of immunity were not binding on the government, that case hardly resolves the question of whether the agents here were acting within the scope of their employment in their dealings with Flemmi and Bulger during a period comprising at least two decades. The heart of the plaintiff's claims is that it was a long-standing "actual and customary," practice, *Howard,* 399 Mass. at 590, 506 N.E.2d 102, for agents in the FBI's Boston office to protect Flemmi and Bulger from investigation and prosecution. The amended complaint is replete with allegations containing examples of instances where agents were directed or allowed to take measures protective of Flemmi and Bulger for the purpose of maintaining them as valuable sources of information in the FBI's effort to prosecute members of LCN. The allegations include assertions that agents ignored— and even permitted— criminal activities

of Flemmi and Bulger that foreseeably could result in the murder of third persons. The fact that later exposure of this conduct may have "embarrassed the agency, damaged the informant program, and thwarted efforts to carry out law enforcement responsibilities," U.S. Reply Br. at 7, does not establish that, at the time, the agents were not acting in furtherance of the FBI's work.

### 2. Circumstances Where a Private Person Would Be Liable

The government also attempts to whittle away the plaintiff's claims by arguing that, because Massachusetts law does not impose a duty on a private person to prevent criminal acts by another person, the plaintiff's allegations that the United States failed to warn or protect Davis are not actionable under the FTCA. *See* 28 U.S.C. § 1346(b). As it did with the "scope of employment" test, the government frames the duty question much too narrowly. While it may be true that *in general,* Massachusetts law does not impose a duty on a private person to "protect another from the wrongful or criminal acts of a third party," Mem. Supp. U.S. Mot. Dismiss at 26, the rule cannot be applied as categorically as the government suggests.

The government argues that the proposition that it has no duty to warn or protect someone from the criminal acts of a third party is a subset of an even more general rule that "[t]he fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose a duty to

---

**6.** The government specifically mentions making arrests, carrying firearms, serving warrants and executing seizures under warrants, uncovering drug law violations, collecting fingerprint cards and identification records, conducting personnel investigations, conducting law enforcement training programs, and operating the National Crime Information Center and the FBI laboratory as being among the duties of an FBI agent. Mem. Supp. U.S. Mot. Dismiss at 18.

take such action." *Id.* (quoting RESTATE-MENT (SECOND) OF TORTS § 314 (1965) (" § 314")). To be sure, there are cases in which Massachusetts courts have found § 314 to be applicable, *see, e.g., Pridgen v. Boston Hous. Auth.,* 364 Mass. 696, 709, 308 N.E.2d 467 (1974); *Warren H. Bennett, Inc. v. Charlestown Sav. Bank,* 3 Mass.App.Ct. 753, 753, 328 N.E.2d 527 (1975); *see also Carrier v. Riddell, Inc.,* 721 F.2d 867, 869 (1st Cir.1983); *Choy v. First Columbia Mgmt., Inc.,* 676 F.Supp. 28, 29 (D.Mass.1987). But to the extent that these cases reinforce § 314, they also imply that Massachusetts recognizes the exceptions to the general rule of § 314.[7] Section 321(1) of the RESTATEMENT (SECOND) OF TORTS (1965), one of these carve-outs, provides that "[i]f the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect," *id.,* and Massachusetts law has embraced the principle, if not the actual text, of this rule, *Commonwealth v. Levesque,* 436 Mass. 443, 449–50, 766 N.E.2d 50 (2002) ("Although we have yet to recognize explicitly § 321 as a basis for civil negligence, we have expressed agreement with its underlying principle. It is consistent with society's general understanding that certain acts need to be accompanied by some kind of warning by the actor." (citation omitted)). In *Levesque,* the court held that the defendants could be held criminally liable for the deaths of six firefighters who perished while fighting a warehouse blaze that the defendants had accidentally started, but failed to control or report to authorities. The court said:

> Where a defendant's failure to exercise reasonable care to prevent the risk he created is reckless and results in death, the defendant can be convicted of involuntary manslaughter. Public policy requires that "one who creates, by his own conduct ... a grave risk of death or injury to others has a duty and obligation to alleviate the danger." We are not faced with the situation of a mere passerby who observes a fire and fails to alert authorities; the defendants started the fire and then increased the risk of harm from that fire by allowing it to burn without taking adequate steps either to control it or to report it to the proper authorities.

*Id.* at 450–51, 766 N.E.2d 50 (alteration in original) (quoting *People v. Kazmarick,* 99 Misc.2d 1012, 417 N.Y.S.2d 671, 674 (1979)). If an individual can be criminally liable for failing to mitigate a hazard of his own creation that results in death, it follows that he also can be subject to civil liability in those circumstances. *See, e.g., Mullins v. Pine Manor College,* 389 Mass. 47, 52 n. 8, 449 N.E.2d 331 (1983) (explaining that because the policy of an all-female college permitting male guests to stay overnight in women's dormitory created a foreseeable risk that unwelcome men would not be detected as intruders, the college had to take "reasonable measures" to guard against that risk)[8]; *id.* at 62, 449

---

7. *See* RESTATEMENT (SECOND) OF TORTS cmt. a (1965) ("The general rule stated in this Section should be read together with other sections which follow. Special relations may exist between the actor and the other, as stated in § 314 A, which impose upon the actor the duty to take affirmative precautions for the aid or protection of the other. The actor may have control of a third person, or of land or chattels, and be under a duty to exercise such control, as stated in §§ 316–320. The actor's prior conduct, whether tortious or innocent, may have created a situation of peril to the other, as a result of which the actor is under a duty to act to prevent harm, as stated in §§ 321 and 322.").

8. In *Mullins,* the court upheld a jury verdict that a college was liable for the injuries a

N.E.2d 331 ("The act of a third party does not excuse the first wrongdoer if such act was, or should have been, foreseen.").

 Furthermore, Massachusetts law would likely impose a duty on a private person to protect another from the wrongful acts of third parties based "on the existence of a special relationship between the negligent person and the person or entity on whom it is sought to impose liability." *Mosko v. Raytheon Co.*, 416 Mass. 395, 400–01, 622 N.E.2d 1066 (1993) (acknowledging doctrine but finding that it did not apply to impose liability on employer for injuries caused by employee's intoxicated driving following an employer-sponsored holiday party); *see also* RESTATEMENT (SECOND) OF TORTS § 319 (1965) ("One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing the same."); *id.* § 315 ("There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless (a) a special relation exists between

the actor and the third person which imposes a duty upon the actor to control the third person's conduct . . . .").[9] A reasonable inference from the allegations of the amended complaint is that the United States had a "special relationship" with Flemmi and Bulger and a consequent duty to the general public to control the actions of these informants. Another theory of liability recognized in Massachusetts law and applicable to the plaintiff's claims against the government here is that of joint liability or liability arising from the aiding and abetting of another in a wrongful act: "For harm resulting to a third person from the tortious conduct of another, a person is liable if he . . . (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other . . . ." *Nelson v. Nason*, 343 Mass. 220, 222, 177 N.E.2d 887 (1961) (drag racing teenager liable for deaths resulting from crash between automobile driven by plaintiff's decedent and another car) (alterations in original) (quoting RESTATEMENT (FIRST) OF TORTS § 876(b) (1939))[10]; *see also Ka-*

female student suffered when she was raped on campus. Although the college relied on § 314 in arguing that it did not have a duty to protect students against the criminal acts of third parties, the court concluded that "this rule has little application to the circumstances of this case." 389 Mass. at 50, 449 N.E.2d 331. Instead, the court held that the college might be liable in light of the evidence either that it was the customary practice of reasonable colleges to take steps to protect resident students from the criminal acts of third parties, or that the college had voluntarily undertaken a duty to protect its students. *Id.* at 50–51, 449 N.E.2d 331. The court rejected the college's argument that the rape was not foreseeable and upheld the jury's verdict that the college had breached that duty by permitting deficiencies in the college's security system. *Id.* at 62, 449 N.E.2d 331.

9. The Supreme Judicial Court cited RESTATEMENT (SECOND) OF TORTS § 315(a) (1965)

(" § 315(a)") with approval in *Jean W. v. Commonwealth*, 414 Mass. 496, 513, 610 N.E.2d 305 (1993) and was prepared to apply it to claims brought under the Massachusetts Tort Claims Act. Before the ruling in *Jean W.* was effective, the legislature abrogated *Jean W.* by enacting M.G.L. ch. 258, § 10(h)-(j), greatly limiting the circumstances under which public employees can be liable for failing to provide police protection. There is no indication, however, that § 315(a) is not a basis for liability of a private person or entity.

10. Section 876 of the RESTATEMENT (FIRST) OF TORTS (1939) in its entirety reads:
§ 876. Persons Acting in Concert
For harm resulting to a third person from the tortious conduct of another, a person is liable if he
(a) orders or induces such conduct, knowing of the conditions under which the act is done or intending the consequences which ensue, or

*batchnick v. Hanover–Elm Bldg. Corp.,* 331 Mass. 366, 368, 119 N.E.2d 169 (1954) ("One who has sustained an injury in person ... by a wrong committed in which several persons have actively participated may bring an action against one or more of them."), *cited with approval in Shantigar Found. v. Bear Mountain Builders,* 441 Mass. 131, 141, 804 N.E.2d 324 (2004); *McGrath v. Sullivan,* 303 Mass. 327, 331, 21 N.E.2d 533 (1939) (defendant who purposefully afforded co-defendant opportunity to have affair with plaintiff's wife was jointly liable for tortious interference with plaintiff's marital rights); *Brown v. Perkins,* 83 Mass. 89 (1861) (jury instruction that defendants could not be civilly liable "as principals for aiding and assisting" a trespass "unless they stood in such relation [to the trespassors] as would naturally enable them to exercise some authority, control or influence over the [trespassors]" was in error; the "true rule" is that "any person who is present at the commission of a trespass, encouraging or exciting the same by words, gestures, looks, or signs, or who in any way or by any means countenances or approves the same, is in law deemed to be an aider and abettor, and liable as principal").[11]

*Halberstam v. Welch,* 705 F.2d 472 (D.C.Cir.1983), *cited with approval in Alberts v. Devine,* 395 Mass. 59, 71, 479

N.E.2d 113 (1985), is a helpful example of how this rule might apply to the plaintiff's claims. In *Halberstam,* the court applied the rule in RESTATEMENT (SECOND) OF TORTS § 876(b) (1979)[12] to hold that a woman could be civilly liable for a murder her boyfriend committed while burglarizing a home. *Id.* at 488. Although the woman had not been present at the scene of the crime, she was nonetheless liable for the murder because she had helped her boyfriend run the continuing criminal enterprise he was advancing at the time he killed the victim. *Id.* at 488. The criminal enterprise consisted of burglarizing homes, selling stolen goods, and money laundering, among other things. Although the woman did not burglarize homes, she played a role in effectuating the "clearly required expeditious and unsuspicious disposal of the goods." *Id.* Even though her "own acts were neutral standing alone, they must be evaluated in the context of the enterprise she aided." *Id.* Moreover, "although the amount of assistance [the woman] gave [her boyfriend] may not have been overwhelming as to any given burglary in the five-year life of this criminal operation, it added up over time to an essential part of the pattern." *Id.*[13]

In sum, there are several theories of liability under Massachusetts law by which

---

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

**11.** The reporter's notes to both the RESTATEMENT (FIRST) OF TORTS § 876 (1939) and the RESTATEMENT (SECOND) OF TORTS § 876 (1979) cite *Brown v. Perkins* as an example of the meaning of "encouragement."

**12.** Section 876(b) of the RESTATEMENT (SECOND) OF TORTS (1979) is essentially identical to the 1939 version of the same section. *See supra* note 10.

**13.** In determining whether the woman had given "substantial assistance" to her boyfriend, the *Halberstam* court considered "the nature of the act encouraged; the amount [and kind] of assistance given; the defendant's absence or presence at the time of the tort; [her] relation to the tortious actor; and the defendant's state of mind." 705 F.2d at 483–84 (alteration in original) (citing RESTATEMENT (SECOND) OF TORTS § 876(b) cmt. d (1979)).

the United States might be liable to the plaintiff for failing to warn or protect Davis from the criminal activities of Flemmi and Bulger. One can reasonably infer from the amended complaint that the course of dealings between the United States on the one hand and with Flemmi and Bulger on the other, created a risk of danger to Davis and a concomitant duty to warn or protect Davis from that danger. The alleged relationship the government had with Flemmi and Bulger was a "special relationship" within the meaning of tort law, creating a duty owed to the general public to control them. In allegedly permitting Flemmi and Bulger to commit crimes with impunity and not warning the foreseeable victims of those crimes, the government gave Flemmi and Bulger "substantial assistance" in murdering Davis. While discovery may show that the facts will not support any of these theories of liability, I cannot say now that, based on the plaintiff's allegations, it is beyond doubt that a private individual in a position analogous to that of the United States would not be liable for failing to warn or protect a potential victim of crime like Davis.

### 3. Discretionary Function Exception

 The government also argues that the plaintiff's claims based on the government's failure to warn or protect Davis, should be dismissed because governmental decisions with respect to protecting the public fall within the so-called discretionary function exception. As explained earlier, the discretionary function exception bars claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

Although later in this litigation it may be necessary to navigate the inlets of the discretionary function exception, at this stage of the proceedings I can rule on the applicability of this defense by reference to a single proposition. Where a party has pleaded that a government employee's conduct was "unconstitutional, proscribed by statute, or exceed[ed] the scope of [the agent's] authority," the conduct does not fit within the discretionary function exception because "a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority." *Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247, 254 (1st Cir. 2003) (quoting in part *Myers & Myers, Inc. v. United States Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir.1975)). As explained in the preceding section, under state law the alleged conduct of the FBI in thwarting the investigation and prosecution of Flemmi and Bulger gave rise to a duty on the part of agents to alleviate the dangers resulting from the FBI-sponsored freedom Flemmi and Bulger had to commit crimes. If indeed the FBI agents were acting outside the scope of their authority (but not outside the scope of their employment) when they undertook various measures to prevent Flemmi and Bulger from being investigated or prosecuted, then those actions were non-discretionary.

### IV. CONCLUSION

For the foregoing reasons, I denied the United States' motion to dismiss by my order of March 31, 2004. .

SO ORDERED.