NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1299                                          Appeals Court
13-P-1301


COMMONWEALTH  vs.  ZHAN TANG HUANG[1] (and fourteen companion
cases[2]).


Nos. 13-P-1299 & 13-P-1301.

Norfolk.     May 8, 2014. - February 11, 2015.

Present:  Rubin, Wolohojian, & Maldonado, JJ.


Homicide.  Wanton or Reckless Conduct.  Fire.  Constitutional
    Law, Search and seizure.  Search and Seizure, Exigent
    circumstances.  Practice, Criminal, Severance, Motion to
    suppress, Admissions and confessions.  Joint Enterprise.
    Evidence, Joint venturer, Photograph.



    Indictments found and returned in the Superior Court
Department on August 19, 2009.

    Pretrial motions to suppress evidence were heard by Wendie
I. Gershengorn, J.; a motion to sever was heard by Kenneth J.
Fishman, J., and the cases were tried before him.


    Amy M. Belger for Zhan Tang Huang.

_____

    [1] Also known as Jason Zhan Tang Huang.

    [2] Six of the companion cases are against Zhan Tang Huang,
and eight are against Andy Zhan Ting Huang.  The defendants'
appeals were consolidated for oral argument and disposition.

Patrick H. Reddington (Kevin J. Reddington with him) for Andy Zhan Ting Huang.
Varsha Kukafka, Assistant District Attorney, for the Commonwealth.

WOLOHOJIAN, J.  Terri Knight and her husband, Oudah Frawi, together with their sons Ali (one year old) and Hassan (two months old), lived in a one-bedroom basement apartment within a multi-unit residential building at 100 Robertson Street in Quincy.  The family slept together in the bedroom.  The apartment did not comply with numerous codes, including those requiring that there be a second exit from the bedroom, that windows be large enough to allow a person to escape through them, and that there be operational smoke and carbon monoxide detectors.  As a result, when an accidental fire broke out in the living room in the predawn hours of March 25, 2009, while the family was asleep, no smoke alarms signaled the danger.  By the time Frawi awoke and (carrying Ali in his car seat) attempted to escape through the living room, the several-hundred-degree fire was too intense for him to reach the only exit.  He retreated to the bedroom where he and both his sons died from burns and smoke inhalation.  Knight was severely injured by the time firefighters rescued her from the bedroom, but she survived.

100 Robertson Street is a four-unit residential building in which two additional "illegal" units had been added:  one in the

basement and one in the attic. The building was bought at auction in August, 2007, as an investment by defendant Andy Zhan Ting Huang (Andy) and his sister-in-law, Jinny Ma, who is married to Andy's brother, Zhan Tang Huang (known as Jason).[3] All three participated in the acquisition, insuring, management, maintenance, and rent collection of the property -- although not each one participated in each of these activities in exactly the same way or to exactly the same extent. For example, Andy located the property and was instrumental in its purchase (contributing half of the purchase price in cash), cosigned the paperwork necessary for the financing of Jinny Ma's half of the property, participated in obtaining property insurance, received rental income, and made distributions to his co-owner (Jinny Ma) at year's end. Jason was the person primarily responsible for the maintenance and upkeep of the property, was the one most often physically present at the property, was the "property manager," and collected rent payments from the tenants. A number of those rent checks were made out to him. Jinny Ma co-owned the property with Andy, obtained property insurance for it, and collected rents.[4] In short, the three collectively

---

[3] Because Andy and Jason share a last name, we use their first names for the sake of clarity.

[4] Jinny Ma's role was less fully described at trial, probably because she had resolved the charges against her by agreement with the Commonwealth before trial.

operated 100 Robertson Street for their mutual benefit as a residential investment property.

Andy and Jason were each charged with three counts of manslaughter, G. L. c. 265, § 13, for wilfully, wantonly, and recklessly neglecting or failing to fulfill their duty to Frawi, Ali, and Hassan as tenants of 100 Robertson Street. They were also each charged with four counts of wanton or reckless violation of the State building or fire code causing serious bodily injury or death,[5] G. L. c. 148, § 34B. Finally, they were

---

[5] The Commonwealth's theory was that the following statutes and codes were violated: (1) G. L. c. 148, § 26B (requiring an "automatic fire warning system" and "automatic smoke detection," in accordance with the State building code); (2) G. L. c. 148, § 26F1/2(c) (requiring that residential building, upon sale or transfer, be inspected by fire department for carbon monoxide detector); (3) 527 Code Mass. Regs. § 24.08(1)(a) (1998) (requiring that automatic smoke detector be maintained in reliable condition, and requiring tests and inspections); (4) 527 Code Mass. Regs. § 24.08(1)(b) (1998) (requiring smoke detection to be under supervision of a responsible person and testing at specific intervals); (5) 527 Code Mass. Regs. § 24.08(3)(c) (1993) (requiring semiannual testing of smoke detectors); (6) 527 Code Mass. Regs. § 24.08(3)(f) (1993) (requiring permanent record of list of tests to be maintained by owner and submitted to fire department); (7) G. L. c. 148, § 27A (prohibiting disabling, disconnecting, or obstructing fire protection device); (8) 527 Code Mass. Regs. § 1.06(2) (2008) (requiring that fire protection systems and devices be maintained and that they not be made unserviceable without prior notice to fire department); (9) G. L. c. 148, § 26E(b) (owners of certain residential buildings to install battery operated smoke detectors outside each sleeping area and interconnected primary power smoke detectors in common hallways and basements); (10) 527 Code Mass. Regs. § 31.04 (2007) (requiring every dwelling unit to have a carbon monoxide detector); (11) 527 Code Mass. Regs. § 12 (2007) (effective Jan. 1, 2008) (Massachusetts

each charged with one count of perjury, G. L. c. 268, § 1. This charge was based on false statements in an application for homeowners insurance made to the Massachusetts Property Insurance Underwriting Association (MPIUA) to the effect that 100 Robertson Street was a four-unit owner-occupied dwelling and that the owners had no other residence. A jury convicted Andy on all charges, and convicted Jason on all but the perjury charge.[6]

On appeal, Andy argues that (1) his motion to suppress evidence obtained at the scene of the fire should have been allowed; and (2) his motion to sever was erroneously denied. Jason argues that (1) the evidence of manslaughter was insufficient; (2) he owed no duty to the tenants of 100 Robertson Street because he had no ownership interest in the property; (3) his statements to police at the scene of the fire should have been suppressed; and (4) the prosecutor's closing

_____

Electrical Code); and (12) over twenty-five separate provisions of the State building code.

[6] Andy was sentenced to two concurrent terms of three years to three years and one day in State prison on the manslaughter charges pertaining to Frawi and Ali. For the manslaughter of Hassan, the reckless violation of the State building or fire code causing serious bodily injury or death, and the charge of perjury, Andy was sentenced to concurrent probationary terms of three years from and after the period of incarceration, each with conditions. Jason was sentenced similarly (with the obvious exception of the perjury charge of which he was acquitted), except that his period of incarceration was two to three years.

improperly appealed to the jury's sympathy.[7]  In addition, both
defendants argue that the judge abused his discretion when he
allowed in evidence three photographs:  two of Frawi's body
which, although largely covered, showed the burnt sole of one
foot and his burnt knee; and one of Ali's body showing his two
legs, the rest of his body obscured by the partially melted car
seat in which Frawi had carried him.  We affirm.

Background.  Taken in the light most favorable to the
Commonwealth, the evidence and the reasonable inferences to be
drawn from it showed the following.

Andy and Jinny Ma bought 100 Robertson Street as an
investment property at auction in August, 2007.[8]  Andy, a college
graduate, has a master's degree in computer science, and was the
assistant manager of a bank.  100 Robertson Street was not his
first investment property.  Jinny Ma also had experience with
property ownership; she owned a separate property in which she
lived with Jason.  Jason did not have an ownership interest in
100 Robertson Street.

---

[7] The latter argument does not satisfy the requirements of
Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), and we
do not consider it.  No transcript citations are provided, nor
does Jason in his brief identify any particular statements made
in closing by the prosecutor.

[8] Andy participated in Jinny Ma's financing of her part of
100 Robertson, and signed the financing documents.

After the auction, Andy walked through the property and discovered that it contained six units.  He taped a copy of the deed to the door of each apartment, and announced to the tenants that he and Jinny Ma were the new owners.

In September, 2007, Andy and Jinny Ma applied to Vermont Mutual Insurance (Vermont Mutual) for property insurance.  They claimed 100 Robertson Street was a four-unit owner-occupied property, and stated that Jinny Ma and her husband lived there.  Neither statement was true.  Although he was neither an owner nor the insured, Jason paid the policy premium with a check drawn from a bank account in his own name; he was also listed as the contact person on the application.

Vermont Mutual's inspection revealed that the property contained five units, and that the hard-wired smoke detector in the rear common hallway was nonoperational.  Vermont Mutual also questioned whether the property was in fact owner-occupied since its correspondence to that address received no response.  Andy and Jinny Ma responded to the insurer's concern by representing that the building would become owner-occupied by November 1, 2007.  In fact, to the contrary, both Andy and Jinny Ma lived elsewhere and had no intention of living at 100 Robertson Street.  On November 16, 2007, Vermont Mutual cancelled the policy because its inspection revealed that the building

contained too many units and that the electrical service to each unit was insufficient.

Apparently anticipating the cancellation by Vermont Mutual, on November 11, 2007, Andy and Jinny Ma applied to Nautilus Insurance Company (Nautilus), this time listing the property as having five units. This statement was false. Jason was again identified as the contact person. Nautilus issued a policy, but its inspection revealed that one common hall lacked a smoke detector, the second floor apartment lacked a carbon monoxide detector, the basement unit lacked smoke detectors, and repairs were necessary to the chimney. All of these were identified as issues affecting "life safety," and Nautilus recommended that they be fixed. Andy and Jinny Ma signed an acknowledgement of repair and represented that they would install additional smoke detectors and carbon monoxide detectors. This they did not do.

Instead, they turned to the Massachusetts Property Insurance Underwriting Association (MPIUA), which is an association that, pursuant to G. L. c. 175C, operates and manages the Massachusetts residual insurance market.[9] The application to MPIUA, which was signed by Andy and Jinny Ma under the pains and penalties of perjury, stated that the

---

[9] See Hudson v. Massachusetts Property Ins. Underwriting Assn., 386 Mass. 450, 452-454 (1982) (reviewing history of MPIUA).

property was owner-occupied and gave Jinny Ma's address as 100 Robertson Street. In response to the question, "Does the applicant reside in or occupy any other premises?" Jinny Ma and Andy responded, "No." The application identified the property as a four-unit dwelling. All of these statements were false.

MPIUA conducted an inspection of the property on April 23, 2008, with Jason,[10] who told the inspector that the basement apartment was in the process of being removed. In fact, as soon as those basement tenants left, the defendants rented the basement unit to Frawi and his family.

MPIUA can issue a homeowner policy only to owner-occupied properties containing no more than four units. However, based on the false representations in the application and during the inspection, it issued a policy covering 100 Robertson Street from March 21, 2008, to March 21, 2009, and renewed that policy for the period March 21, 2009, to March 21, 2010.

Andy, Jason, and Jinny Ma were collectively involved in operating 100 Robertson Street as an investment property for their mutual benefit. The property needed work, and almost all of it was performed by Jason. Andy, Jason, and Jinny Ma all collected rent, and the rent checks were made out variously to each of them. It seems to have made no difference to Andy,

---

[10] The application identified Jason as the person to be contacted to arrange an inspection.

Jinny Ma, or Jason to whom the rent was paid, and the tenants made rent payments to all three interchangeably. Although Andy and Jinny Ma announced themselves as the new owners immediately after the auction, in the course of a dispute with one of the tenants, Jason stated that he was the landlord. Consistent with this, arrangements to rent apartments were made by both Andy and Jason. After the fire, it was Jason who returned the tenants' security deposits. Tenants would call either Jason or Andy to request repairs or to complain that repairs had not been made. When a tenant called Andy to request a repair, he would refer that request to Jason. Some of those repairs and requests are directly relevant to the charges here, and so we set them out in some detail.

As noted above, the defendants maintained six units in the property, but only the four units located on the first and second floors were legal. The basement and attic apartments were not. Several tenants complained about the lack of smoke detectors. When the attic tenant complained to Jason about the absence of smoke detectors in the common halls, Jason said it was too expensive to fix the hardwiring.[11] In 2008, the tenant informed both Jason and Andy that the smoke detectors in the attic apartment were not working. Although Jason said he would

---

[11] Jason did, though, put up a battery-powered smoke detector in the hall.

fix them, he never did. The tenant's brother asked Jason what would happen to the children in the apartment should a fire occur, and Jason responded, "[I] don't care." Andy responded the same way on a later date when told there was no hot water. When informed that the attic apartment was "illegal," Jason acknowledged that fact but told the tenant, "I'll pay the $10,000 fine."

On March 7, 2009 -- slightly over two weeks before the fire -- a Quincy police officer responded to a call reporting a problem with the heat in the attic apartment. The officer found there was neither heat nor hot water; the tenant had been without hot water for five days. The officer also observed that the apartment did not have a second exit, and that the only smoke detector in the apartment did not work. These conditions alarmed him, and he unsuccessfully tried to locate Andy to discuss them. The officer also reported the safety issues to the Quincy department of inspectional services.

As a result, the Quincy health department conducted an inspection two days later, on March 9, 2009. There still was no hot water in the attic apartment, and the smoke detector was not working. There was also no handrail on the stairway leading to the apartment, the ceiling height was inadequate, and there was only a single means of egress from the apartment. Given the seriousness of the absence of smoke detectors, the inspector

called Andy immediately and informed him of the violations.  He also expressed his concern that the apartment was "illegal."  Andy said that he was aware of that fact, and was trying to remove the tenants.  The inspector told Andy that the absence of functioning smoke detectors was "a condition deemed to endanger," and instructed him to correct the problem within twenty-four hours.  He also told Andy that a formal written notice would follow, and that he would conduct a follow-up inspection.

The formal notice was sent the following day, identifying the following violations in the attic unit:

- failure to maintain smoke detectors;

- nonfunctioning smoke detector in the living room;

- failure to provide a handrail on the stairs leading to the apartment; and

- failure to provide hot water.

Andy was instructed that the smoke detectors and lack of hot water had to be fixed within twenty-four hours, and that the apartment would be reinspected on or about March 20, 2009.[12,13]

---

[12] The notice was sent by certified mail to Andy's address on file.  But it was returned because, despite several delivery attempts, Andy did not sign for it or pick it up.  Andy had given 100 Robertson Street as his address, which was not true.

[13] In addition to sending formal notice to Andy, the health inspector also referred the matter to the Quincy building and fire departments, notifying them that the attic apartment was

As he had stated, the inspector followed up with the tenant in order to find out whether the violations had been cured.  The hot water problem had been addressed, but the others had not, and so the inspector again spoke to Andy -- this time on March 24, 2009, the day before the fire.

Like the tenant in the attic apartment, the tenant on the first floor complained to Jason about the absence of smoke detectors.  There were also no smoke detectors in a second floor apartment.  Similarly, the basement apartment did not have functioning smoke detectors.  Frawi and Knight's roommate (who had lived with them in the basement apartment until just two days before the fire when, by happenstance, he moved away) complained regularly to Jason about the absence of smoke detectors, alerted him to the danger it presented, and reminded him that there were small children living in the apartment.  Although Jason promised that he would install a smoke detector, he never did.

Right before Frawi and his family moved in, Andy and Jason removed portions of the dropped ceiling in the basement apartment in order to repair some leaking plumbing.  Behind the dropped ceiling was a hard-wired smoke detection system, with two detectors.  One of those detectors was wrapped in a rag in

"illegal," that there was only a single means of egress, and that the smoke detectors were not working.

order to keep it from functioning. After repairing the leaking pipe, Andy and Jason replaced the ceiling tiles, covering the smoke detectors.

After the fire, it was discovered that there had been functioning electrical wiring to those detectors, but that the circuit breaker for those detectors (as well as those on the stairwell) had been turned "off." There was no evidence from which the jury could reasonably have inferred that the defendants wrapped the detector in a rag. However, the evidence could permit the jury reasonably to infer that the defendants knew there was a hard-wired smoke detection system in the building that extended to the basement apartment and that they knew that it had been rendered nonoperational, whether by wrapping one of the detectors in cloth, cutting the circuit, or by covering the detectors over with ceiling tiles -- circumstances they did nothing to rectify.

The fire occurred in the early morning hours of March 25, 2009, while Frawi, Knight, Ali, and Hassan slept in the bedroom of the basement apartment. The fire was caused by a small decorative electric lamp the family kept illuminated on a windowsill in the living room. That lamp tipped onto the couch, which ignited. Smoke and fumes then spread throughout the basement apartment and the apartments above. The fire itself, however, was confined to the basement apartment, where it was

most intense (hundreds of degrees) in the living room, through which occupants of the bedroom had to pass to reach the only means of egress from the apartment. Functioning smoke detectors would have alerted the victims to the danger of the fire in time for them to have escaped or avoided injury.

We reserve additional facts to our discussion of the legal issues raised.

Discussion. 1. Andy's motion to suppress. Trooper Michael Peters, a member of the State police fire and explosion investigation unit attached to the State fire marshal's office, reported to 100 Robertson Street at approximately 5:15 A.M., when the building was still smoldering and firefighters remained in the building to attend to "fire extensions."[14,15] Because firefighters were not yet finished, the trooper was not permitted to enter the building until 7:00 A.M., at which point he entered the building to conduct an investigation into the fire's origin and cause. Smoke was still emanating from the burning debris, and the bodies of the deceased were still present. The trooper's investigation, which entailed an

---

[14] Fire extensions are areas where fire can spread through walls and other conduits.

[15] The facts in this section are drawn from the motion judge's findings after an evidentiary hearing on the motion to suppress, which we accept unless clearly erroneous (a contention the defendant does not make). See, e.g., Commonwealth v. Scott, 440 Mass. 642, 646 (2004).

examination of all floors of the building, tracing and examining smoke and fire patterns, did not end until about 3:00 P.M.

The trooper concluded that the fire originated in the basement, and that it was largely contained in the basement apartment. Damage to the upper floors was caused by smoke alone. He found that the most severe damage occurred in the basement living room, where he found a melted piece of plastic with an electric motor in the burnt debris. It was later discovered that this belonged to a decorative lamp that had been on the windowsill. The trooper posited that an electric short had occurred, thus melting the lamp, which had fallen onto the couch below and ignited the premises.

Andy moved to suppress the piece of plastic and motor -- the only physical evidence seized as a result of the trooper's investigation. Andy argued that the inspection, which was conducted without a warrant, was an unconstitutional search because no exigency existed once the last flame of the fire had been extinguished. The motion judge correctly ruled that this argument was based on a misreading of Michigan v. Tyler, 436 U.S. 499, 510 (1978), which (contrary to Andy's argument) does not create a bright-line rule that a warrant is required to investigate the scene of a fire after the last flame has been extinguished. Instead, the Court held that "officials need no warrant to remain in a building for a reasonable time to

investigate the cause of a blaze after it has been extinguished." Ibid. We have restated this same standard of reasonableness in our own cases. See Commonwealth v. Jung, 420 Mass. 675, 682-683 (1995) (no warrant needed to enter home and investigate within reasonable time after fire was extinguished). "[I]f the warrantless entry to put out the fire and determine its cause is constitutional, the warrantless seizure of evidence while inspecting the premises for these purposes also is constitutional." Michigan v. Tyler, 436 U.S. at 510. The judge did not err in denying Andy's motion to suppress.

Changing tack on appeal, Andy now argues that the evidence should have been suppressed because the investigation continued for an unreasonable length of time. This argument was not presented below, and is accordingly waived. See Mass.R.Crim.P. 13(a)(2), as appearing in 442 Mass. 1516 (2004); Commonwealth v. Quint Q., 84 Mass. App. Ct. 507, 514 (2013). Even were we to conclude that the search continued an unreasonable length of time (a conclusion we assume only arguendo), that conclusion would not help Andy. The plastic piece and motor that were the subject of the motion to suppress were never offered or admitted into evidence. Although a photograph of the objects was admitted, Andy did not object to its admission and, moreover, the photograph was not the subject of the motion to suppress. Andy does not argue that the photograph should not have been

admitted, nor does he claim that a substantial risk of a miscarriage of justice resulted from its admission. See Commonwealth v. Maylott, 43 Mass. App. Ct. 516, 519 (1997) (evidence admitted without objection at trial and without a pretrial motion to suppress will be examined only for substantial risk of a miscarriage of justice). Nor could such an argument credibly be made; there was no dispute about what sparked the fire, and the defendants' liability did not turn on it.

2. Andy's motion to sever. "Absent a constitutional requirement, whether the indictments joined for trial should be severed is a matter within the sound discretion of the judge, [and his] decision will be reversed only if there has been a clear abuse of discretion." Commonwealth v. Allison, 434 Mass. 670, 679 (2001), citing Mass.R.Crim.P. 9(a)(3) and 9(d)(2), 378 Mass. 859 (1979). "The defendant bears the burden of demonstrating that prejudice will result from a failure to sever the charges." Commonwealth v. Delaney, 425 Mass. 587, 593-594 (1997), cert. denied, 522 U.S. 1058 (1998), citing Commonwealth v. Gallison, 383 Mass. 659, 671 (1981).

Relying on Bruton v. United States, 391 U.S. 123 (1968), Andy argues that the judge erred in not severing his case because he (Andy) was prejudiced by the introduction in evidence of Jason's otherwise inadmissible extrajudicial statements.

Andy's argument is not enhanced by his failure to identify the statements he claims run afoul of Bruton or by his decision not to include in the record appendix his entire motion to sever. The one page of the motion he has included in the record on appeal does not identify any specific statements. We confine our review, therefore, to the only statement we can infer was brought to the judge's attention, namely, Jason's statement that he would "pay the $10,000 fine," which was made in response to the attic tenant's complaint that the apartment was "illegal."[16]

"The trial judge concluded properly that there was sufficient evidence of joint venture and that, therefore, out-of-court statements of the joint venturer[] made during the course of the 'cooperative effort and in furtherance of its goal' could be introduced against the other joint venturer[]." Commonwealth v. Santos, 463 Mass. 273, 289-290 (2012). See Mass. G. Evid. § 801(d)(2)(E) (2014). As described in the first part of this opinion, the evidence amply supported a conclusion that Andy, Jason, and Jinny Ma were engaged in a cooperative effort to operate 100 Robertson Street as an investment rental property without regard to the safety or well-being of their tenants, whether through renting "illegal" apartments, violation

---

[16] We draw this inference based on the fact that this is the only statement by Jason specifically identified in the judge's decision on the motion to sever.

of various building and housing codes, or by failing to respond to the numerous times they were notified -- by insurers, tenants, and inspectors -- that smoke detectors needed to be installed or replaced. Jason's statement to the attic tenant closely related to this collaborative enterprise; it was made in direct response to the attic tenant's statement that the apartment was "illegal" and that the various defects presented a danger, particularly to children. See Commonwealth v. Stewart, 454 Mass. 527, 534 (2009), quoting from Commonwealth v. Allison, 434 Mass. at 675 ("[O]ut-of-court statements by joint criminal participants are admissible against the others if the statements are made both during the pendency of the cooperative effort and in furtherance of its goal").[17]

3. Admission of photographs. Both defendants objected to the admission of three photographs taken of the bodies of Frawi and Ali before they were removed from the scene. The two of Frawi show his body largely covered, but show the burnt sole of one foot and his burnt knee. The one of Ali shows the child's

---

[17] Because we conclude there was no error, we need not reach Andy's argument concerning prejudice. However, we note that, as soon as the testimony was introduced (over Andy's objection), the judge gave a detailed, strong, and clear instruction that the jury could not consider the statement unless and until they first found, beyond a reasonable doubt, that a joint venture existed, that the statement occurred while the joint venture existed, and that the statement was relevant to the joint venture. This instruction was repeated in the judge's final charge to the jury.

two legs; the rest of his body is obscured by the partially-melted car seat in which he customarily slept and in which his body was found. The defendants argue that admission of the photographs constituted prejudicial error requiring reversal of their convictions.

"The admissibility of photographic evidence is left to the discretion of the trial judge." Commonwealth v. Tassinari, 466 Mass. 340, 349 (2013), quoting from Commonwealth v. Waters, 399 Mass. 708, 715 (1987). "[I]f the photographs possess evidential value on a material matter, they are not rendered inadmissible solely because they are gruesome or may have an inflammatory effect on the jury." Commonwealth v. Tassinari, supra, quoting from Commonwealth v. Ramos, 406 Mass. 397, 407 (1990). The defendants do not seriously contest that the photographs had evidential value. The photographs were relevant to the Commonwealth's theory that Frawi, carrying Ali in his car seat, had attempted to escape through the burning living room to reach the only passage to safety but was forced to retreat to the bedroom, from which there was no escape. The photographs showed that Frawi's burns were different from, and more severe than, those of Knight and Hassan, who remained in the bedroom. Also shown was Ali's melted car seat. Together, these supported the inference that Frawi and Ali had gone into the living room where the most intense heat of the fire was located -- and that the

absence of functioning smoke detectors had prevented the occupants from being awakened before the fire had progressed to the point where escape was impossible.  Because the photographs also show that Frawi's and Ali's bodies were found in the bedroom after the fire, they also support the inference that Frawi had been unable to pass through the living room to safety and had been forced to retreat to the bedroom, from which there was no exit.  Frawi's body is shown on the bedroom floor, near the door leading to the living room, but facing in the direction of the too-small bedroom window.  There is no doubt that the photographs were relevant to the question whether the defendants' inactions caused the victims' deaths.[18]

The defendants argue, however, that the photographs were so gruesome that their prejudice outweighed their relevance such that the judge abused his sound discretion in admitting them.  See Commonwealth v. DeSouza, 428 Mass. 667, 670 (1999).  We disagree.  Unlike in Commonwealth v. Richmond, 371 Mass. 563, 565 (1976), upon which the defendants rely, the photographs here

---

[18] The defendants argue that the photographs were irrelevant because the defendants did not contest how the victims died. However, "[e]ven if a defendant agrees to stipulate to the facts that an offered photograph tends to prove, it is generally not error to admit it." Commonwealth v. DeSouza, 428 Mass. 667, 670 (1999), citing Commonwealth v. Nadworny, 396 Mass. 342, 367 (1985), cert. denied, 477 U.S. 904 (1986).  More importantly here, absent a stipulation that the defendants caused the victims' injuries and death, it was not enough for the defendants simply to agree that the fire caused them to die.

do not depict much of the victims' bodies.  Nor do they depict postmortem injuries having nothing to do with the crime.  Moreover, the judge carefully reduced the number of photographs allowed in evidence from the more than twenty offered by the Commonwealth, and excluded all that showed the victims' full bodies or the full extent of their injuries.  We have obtained the original exhibits from the trial court and our independent review of them persuades us that, as sad as they are, the judge did not abuse his discretion in concluding that their relevance outweighed their prejudice.

4.  Sufficiency of the evidence against Jason.  Pointing to evidence that he performed many repairs and much maintenance on the property, Jason contends that the evidence did not suffice to prove beyond a reasonable doubt wanton or reckless conduct by any act of omission.  Although it is true that there was evidence that Jason made repairs to the property and responded to tenants' requests for repairs, there was ample contrary evidence (as set out above) to the effect that he routinely failed to respond to requests to repair or replace missing smoke detectors, that he was warned of the safety risk involved in not installing smoke detectors, and that he was willing to risk the safety of the tenants in exchange for financial benefit to himself, Andy, and Jinny Ma.  Any conflict in the evidence did not affect the sufficiency of the Commonwealth's proof and was

for the jury to resolve.  See, e.g., <u>Commonwealth</u> v. <u>Ruci</u>, 409 Mass. 94, 97 (1991) ("inconsistencies in the witnesses' testimony . . . go to their credibility and do not affect the sufficiency of the evidence").  Viewed under the standard we are charged to apply, <u>Commonwealth</u> v. <u>Latimore</u>, 378 Mass. 671, 676-677 (1979), the evidence sufficed to prove that "the risk of death or grave bodily injury [was] known or reasonably apparent, and the harm [was] a probable consequence of the defendant's election to run that risk or of his failure reasonably to recognize it."  <u>Commonwealth</u> v. <u>Levesque</u>, 436 Mass. 443, 452 (2002), quoting from <u>Sandler</u> v. <u>Commonwealth</u>, 419 Mass. 334, 336 (1995).

5.  <u>Duty of care</u>.  Jason argues that the evidence was insufficient to prove he owed a duty to the tenants of 100 Robertson Street because, he argues, only owners owe duties to tenants.  Although made as an argument concerning sufficiency of the evidence, in fact, as we explain below, the argument is more properly viewed as a mixed question of law and fact.

Because the Commonwealth's theory of manslaughter rested entirely on Jason's omissions, the Commonwealth was required to prove that he had a duty to act.[19]  "The essence of wanton or

---

[19] It is important to note that, although his brief draws no distinction, Jason's argument is relevant only to the manslaughter convictions.  His convictions under G. L. c. 148, § 34B, stand on a different footing.  That statute provides that

reckless conduct is intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another."  Commonwealth v. Welansky, 316 Mass. 383, 399 (1944).  See Commonwealth v. Levesque, 436 Mass. at 448 ("[a]n omission . . . may form the basis of a manslaughter conviction where the defendant has a duty to act").

Duty may be established in one of two ways.  The first is where the defendant has a special relationship to the victim.

---

"[a]ny person who wantonly or recklessly violates the state building code or state fire code and thereby causes serious bodily injury or death to any person shall be punished . . ." (emphasis added).  No special relationship is required under the statute.  Of course, a person cannot be convicted under § 34B unless he or she was responsible for complying with the particular underlying building or fire code.  Given Jason's role in holding himself out as capable of addressing code requirements for smoke and fire detection, he made himself responsible for compliance.

Although some of the alleged underlying statute and code violations in this case apply only to "owners," e.g., G. L. c. 148, § 26E; 527 Code Mass. Regs. § 24.08(3)(f) (1993), many do not.  See, e.g., G. L. c. 148, § 27A (any "person"); G. L. c. 148, § 34B (same); 527 Code Mass. Regs. § 31.04(1)(a) (2007) (owners, landlords, and superintendents); 527 Code Mass. Regs. § 24.08(1)(b) (1998) ("a responsible person"); Rule 8 of the Massachusetts Electrical Code, as appearing in 527 Code Mass. Regs. § 12.00 (2007) ("person, firm or corporation").  Others of the pertinent statutes and codes, through silence, appear not to be limited to owners either.  See, e.g., G. L. c. 148, § 26F1/2(c); G. L. c. 148, § 26B; 527 Code Mass. Regs. § 24.08(1)(a) (1998); 527 Code Mass. Regs. § 24.08(3)(c) (1993); 780 Code Mass. Regs. §§ 1010.1, 3400.3 (1997).

The codes were admitted in evidence at trial.

See Commonwealth v. Twitchell, 416 Mass. 114, 117-118 (1993) (parent-child special relationship). See also Commonwealth v. Welansky, 316 Mass. at 397 (person in control of business premises has duty of care for safety of customers). The second is where the defendant "creates a situation that poses a grave risk of death or serious injury to another." Massachusetts Superior Court Criminal Practice Jury Instructions § 2.8.1 (Mass. Continuing Legal Educ. 2d ed. 2013).[20] See Commonwealth v. Levesque, 436 Mass. at 450-451 (persons who set fire created a situation that posed a grave risk of death such that they had duty to report it). We are concerned in this case only with the first of these.

"The existence of a relationship giving rise to a duty is a question of fact for the jury although the duty arising from a relationship is a matter of law." Massachusetts Superior Court Criminal Practice Jury Instructions § 2.8.1, at 2-76 n.29 (Mass. Continuing Legal Educ. 2d ed. 2013), citing Commonwealth v. Twitchell, 416 Mass. at 116-117.[21] Thus, in this case, it was

---

[20] We acknowledge that the model jury instructions cited were not in effect at the time of trial. However, the cited instructions reflect the law as it existed at the time of trial, and the judge's instructions on involuntary manslaughter tracked the new instructions closely, if not identically.

[21] This allocation between law and fact parallels that in civil negligence cases, where we have stated that "[w]hether a defendant has a duty of care to the plaintiff in the circumstances is a question of law for the court, to be

for the jury to determine whether Jason was the property manager

of 100 Robertson Street, as the Commonwealth contended.  But it

was for the judge to determine whether that relationship gave

rise to a duty of care to the tenants.  Jason does not argue

that the evidence was insufficient to prove that he was the

property manager of 100 Robertson Street.  Indeed, it was

undisputed that Jason was the property manager, and there was

also sufficient evidence to find that he was the landlord.

Jason argues, however, that because he was "only" the property

manager, he did not have a special relationship to the tenants

that imposed on him a duty of care.[22]  Stated otherwise, pointing

to authorities in the field of civil landlord-tenant law,[23] his

argument is in essence that only owners owe duties to tenants.

---

determined by reference to existing social values and customs
and appropriate social policy."  O'Sullivan v. Shaw, 431 Mass.
201, 203 (2000), citing Davis v. Westwood Group, 420 Mass. 739,
743 (1995).

[22] This argument is in part based on a misreading of
Commonwealth v. Welansky, 316 Mass. at 399.  Although it is true
that Welansky was the owner of the Cocoanut Grove nightclub in
Boston, the scene of a horrific fire, the case cannot be read to
limit criminal responsibility for manslaughter by acts of
omission to owners of premises.  See id. at 387, 402 (if
defendant-owner had delegated responsibility for safety of exits
to others, they could have been held criminally responsible).

[23] Specifically, Jason points to G. L. c. 186, § 15E
(building owners) and § 15F (landlords), and Warshaw,
Massachusetts Landlord-Tenant Law § 2:2 (2d ed. 2001).

Although we have customarily turned to civil law when formulating duties in the criminal context, see Commonwealth v. Levesque, 436 Mass. at 449, criminal liability "is not limited to those duties whose violation would create civil liability." Commonwealth v. Twitchell, 416 Mass. at 117. In any event, in this case, a duty was imposed on Jason through many of the underlying building and fire codes.[24] See note 19, supra.

Moreover (regardless of the requirements of the various codes), the facts established that Jason was the type of property manager who owed a duty to the tenants of 100 Robertson Street. The evidence was uniform that Jason was responsible for all maintenance and repairs to the property. He was identified as the property manager to insurers, inspectors, and tenants. All tenant requests for repairs were made to Jason, either directly or indirectly when they were referred to him by Andy. Jason held himself out as capable of addressing requests for repairs, including with respect to smoke detectors and fire safety. In addition, although Jason did not have an ownership interest in the property, he was as integrally involved in the building's operations as its owners, who were his brother and

_____

[24] Our discussion here pertains to Jason's liability as a principal. He was also charged and tried on a joint venture theory. Assuming he was properly charged as a joint venturer, see note 26, infra, his liability would have run additionally through Andy's violations of building and fire codes that applied only to owners.

his wife.  He held himself out to at least one of the tenants as the landlord.  He and Andy interchangeably entered into rental arrangements with the tenants, and he collected rent payments, which were often made out to him in his name.  In short, the judge did not err in concluding that Jason owed a duty of care to the tenants of 100 Robertson Street.

Finally, Jason argues it was error to instruct the jury that if they found Jason was a property manager or a landlord, then, as a matter of law, he had a special relationship with the tenants.[25]  Both defendants objected to this portion of the instruction.  Even if we were to accept Jason's argument that the instruction was overbroad as a general proposition (because not all property managers are alike and it is possible to imagine situations where a manager's involvement in the property is so minimal that it would not give rise to a special relationship for these purposes), it was not so in this case.

_____

[25] The judge instructed:

> "The second element is that there was a special relationship between the defendant and the victim which gave rise to a duty of care or the defendant created a situation that posed a grave risk of death or serious injury to another.  I instruct you that a relationship between an owner, landlord, or property manager and a tenant is a special relationship which gives rise to a duty of care.  If you find that either defendant had one of these relationships . . . with the victims, then you shall find that the defendant had a special relationship with the victims that gave rise to a duty of care."

Jason's involvement in 100 Robertson Street was pervasive, including not only the maintenance of the property but also many of the activities and responsibilities customarily associated with owners and landlords (such as rent collection, obtaining insurance, and lease negotiation).[26]

6. <u>Statements to officials</u>. Jason argues that his statements to fire and other officials at the scene on the morning of the fire (including the purchase price for the property, that it was purchased in "as is" condition, and that no work had been done on the property after its purchase) should have been suppressed because he did not receive Miranda warnings. See <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436 (1966). Independently, he argues that his spontaneous question when he arrived on the scene, "Is it a total loss?" should not have been admitted because any probative value was outweighed by its prejudicial effect.

In reviewing a decision on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and

---

[26] Jason also argues that the evidence was insufficient to establish a joint venture with Andy and, accordingly, he should not have been convicted based on Andy's omissions as an owner. Jason further contends that the joint venture instruction in <u>Commonwealth</u> v. <u>Zanetti</u>, 454 Mass. 449 (2009), should not have been given. The arguments are made cursorily and do not merit discussion. In any event, in light of our conclusion regarding Jason's liability as a principal, there is no need to reach his arguments concerning joint venture.

conclusions of law.'"  Commonwealth v. Scott, 440 Mass. 642, 646

(2004), quoting from Commonwealth v. Jimenez, 438 Mass. 213, 218

(2002).  Jason does not argue that any of the judge's subsidiary

findings are clearly erroneous.  We set them out here:

> "After major fire suppression efforts were performed, officials attempted to contact the owners of the building.  There was some confusion at the scene as to who the actual owner was, and multiple attempts were made to identify addresses.  At some point, [Jason's] address was proffered, and officials went to his home address in an effort to locate the owner of the burning residence.

> "At approximately 6:30 a.m., an officer arrived at [Jason's] home, and informed him that a fire had occurred at the 100 Robertson Street address.  The officer then asked [Jason] to accompany him down to the scene of the fire.  [Jason] and his wife, Ma, drove to the scene, with the officer following behind them.  Upon arriving, the street had been cordoned off due to the fire, and so the escorting officer directed [Jason] and Ma to drive through and park along the curb.  As [Jason] and Ma waited outside the 100 Robertson Street address, one of the officers on the scene heard someone say not to let them leave.

> "At that point, Trooper Peters escorted [Jason] and Ma into the cab of a 'rehab' fire truck, due to the cold weather outside.  A rehab fire truck is a vehicle, designated by fire officials to warm firefighters during the frigid months.  It was there that Peters spoke with [Jason] and Ma.  Ma did not understand English, but [Jason] interpreted for her.

> "Peters asked them questions related to the property, e.g., who the owners were, who occupied the building, when it was bought, who maintained it, etc. The conversation was brief, and lasted a matter of minutes.  Trooper Morris and Detective Pacino also spoke with [Jason] and Ma for approximately five minutes on the same subjects.  In response, [Jason] identified himself as the property manager, and his brother, Andy, as the owner.  He then gave Morris his

brother's phone number, and told Peters that he would
work on getting a list of the occupants for him.  Both
conversations, in sum, lasted between five and ten
minutes.  Afterwards, [Jason] and Ma left."

The issue is whether the judge properly concluded that Jason was not in custody, for purposes of Miranda, at the time he made the incriminating statements.  There are four indicia of custody:  "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that the person is a suspect; (3) the nature of the interrogation, i.e., whether the interview was aggressive or, instead, informal; and (4) whether, at the time the incriminating statement or statements were made, the suspect was free to end the interview by leaving the place of the interrogation or by asking the interrogator to leave, or, alternatively, whether the interview terminated with the defendant's arrest."  Commonwealth v. Sneed, 440 Mass. 216, 220 (2003).

The judge correctly examined and applied all four indicia. Jason was questioned in a public venue, in the presence of his wife, and in familiar surroundings (outside a property his wife owned and that he was intimately involved in running).  Second, Jason was neither a suspect nor a subject of a criminal investigation.  The questions were designed to elicit basic information about the property and its tenants, not to uncover

incriminating information about Jason.  Third, the questioning was informal and brief.  Fourth, an objective person in Jason's circumstances would have felt free to leave.  Jason had arrived on the scene in his own vehicle with his wife and he left the same way.  Although the judge heard testimony that someone said that Jason and Jinny Ma should not be allowed to leave, he found there was no evidence to suggest that these words were spoken to Jason or Jinny Ma.  In short, the judge did not err in concluding that Jason failed to establish that he was in custody.

We also see no abuse of discretion by the judge in admitting Jason's spontaneous statement.  Jason's unsolicited question when he arrived at the scene, "Is it a total loss?" went to his state of mind concerning the safety and well-being of the tenants.  To the extent the statement was prejudicial, it was only in the sense that it did not benefit Jason -- not that it was unduly so.

<u>Judgments affirmed</u>.